IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| D'OLIVE BAY RESTORATION AND PRESERVATION COMMITTEE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS; et al., | ) | CIVIL ACTION NO. 05-0561-BH-D |
| | ) | |
| Defendants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CYPRESS/SPANISH FORT I, L.P., | ) | |
| | ) | |
| Intervenor/Defendant | ) | |

FINDINGS OF FACT; CONCLUSIONS OF LAW
AND ORDER

This action is before the Court on the parties cross-motions for summary judgment

(Docs. 26-27, 47-49, 50-51 and 56).  This case involves a challenge to a permit issued by

the United States Army Corps of Engineers ("Corps") to Cypress Equities ("Applicant" or

"Cypress Equities" a/k/a "CSF") to fill wetlands and a streambed in conjunction with the

construction of a 220 acre retail shopping center ("Project") in Spanish Fort, Alabama.

The Plaintiff, D'Olive Bay Restoration and Preservation Committee, Inc. ("D'Olive"),

filed this action against the Corps pursuant to the Administrative Procedure Act ("APA"),

5 U.S.C. § 701, *et seq.*, claiming that the Corps violated the National Environmental

Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*, and the implementing regulations issued

by the Council on Environmental Quality ("CEQ")(40 C.F.R §§ 1500-08), the Corps (33 C.F.R. Part 230), and the US Environmental Protection Agency ("EPA")(40 C.F.R. 230). Cypress/Spanish Fort I, L.P. ("CSF"), the developer of the Project, was granted leave to intervene as an Intervenor-Defendant. (Doc. 12).

D'Olive alleges the Corps failed to comply with NEPA in a variety of ways. First, it alleges that the Corps failed to adequately consider the direct and indirect impacts of the Project, including impacts upon (a) water quality and downstream siltation; (b) endangered species; (c) air quality; (d) noise in surrounding neighborhoods; (e) traffic; and (f) aesthetics. Second, D'Olive alleges that the Corps failed to comply with NEPA requirements in its analysis of cumulative impacts of the Project. Third, D'Olive alleges that the Corps improperly segmented the Project from (1) "project related transportation infrastructure improvements," and (2) a second permit application filed with the Corps By Cypress Equities three months after the issuance of the permit challenged here. Finally, D'Olive alleges that the Corps' alternatives analysis is "flawed." D'Olive seeks summary judgment on its claims for relief and asks the Court to vacate the permit issued by the Corps and instruct the Corps to prepare an Environmental Impact Statement ("EIS").

The Corps and CSF both contend that the Corps fully complied with the requirements of NEPA and all applicable implementing regulations, objectively evaluated the environmental effects of the proposed action, and sufficiently examined alternatives so as to allow a reasoned choice in the decision to permit the Project. They further contend that the record documents the "hard look" given by the Corps to all the potential

impacts of the Project, including the cumulative impacts.  Thus it is asserted that the

Corps' Finding of No Significant Impact ("FONSI") and reliance on an Environmental

Assessment ("EA") for permit issuance was wholly appropriate, and made in full

compliance with NEPA and the Corps' regulations.  Finally, they contend that an

Environmental Impact Statement ("EIS") was not needed in order for the Corps to fully

evaluate all of the Project's environmental impacts and there was no segmentation of any

type by the Corps.  The Corps and CSF argue that they are each entitled to summary

judgment because the issuance of the permit in this case is in all respects in full

compliance with NEPA and the relevant regulations.

Upon consideration of the motions, plaintiff's response in opposition to the cross-

motions filed by the Corps and CSF (Docs. 58-59), the replies filed by the Corps and CSF

(Docs. 60-61), the Administrative Record (Doc. 35), and all other pertinent portions of

the record, the Court concludes that the motions filed by the Corps and CSF are due to be

granted while the motion filed by D'Olive is due to be denied.

## FINDINGS OF FACT

### A.   The Parties and the Project

1.      The plaintiff in this action, D'Olive, is a not-for-profit environmental

organization that advocates the protection and preservation of water quality, scenic

beauty, animal and aquatic species and habitat of the Mobile Bay area.

2.      The defendant in this action, the Corps, is an agency of the United States of

America that has been delegated responsibility by the Department of the Army for, *inter*

*alia*, construction, management and operation of various lakes and other water resources of the United States of America. The Corps' management of water resources includes authority over wetlands and permitting for the discharge of dredged or fill material into the navigable waters of the United States.

3.      The intervenor-defendant in this action, CSF, is a commercial real estate developer.  CSF applied for and received a permit from the Corps to fill 13.4 acres of wetlands and 450 linear feet of stream to enable the construction of a shopping center in Spanish Fort, Alabama.[1]

4.      CSF intended to locate a development site to create "a 220-acre mixed use commercial development with a 130,000-square foot Bass Pro Shops as the main attraction and primary anchor tenant." (AR Vol. 1, § 2, p. 0014).

5.      CSF selected the site currently at issue as the location for the development which it christened the Spanish Fort Town Center (the "Project"). The Project site is a 220-acre wooded, and occasionally timbered, parcel of land located on the northeast corner of the intersections of U.S. Highway 90 and Interstate 10 (subsequently referred to as the "development site" or simply "the site"). (AR Vol. 1, Tab 2, p. 0014). The site consists primarily of rolling hills with fairly steep topography.  Elevations range from a

---

[1]The permit was originally issued to permit applicant Cypress Equities. On June 29, 2005, the Corps transferred, at Cypress Equities' request, the permit to a related corporate entity, Cypress/Spanish Fort I, L.P., which currently holds the permit. (AR Vol. II § 63, p. 0836). Cypress/Spanish Fort I, L.P. is the proper party to this lawsuit. For the sake of simplicity, the Court will refer to both entities collectively as "CSF."

few feet above sea level to approximately 175 feet.  Many of the upland soils on the site
are composed of fine, loamy sand with rapid runoff and a high hazard of erosion.
Of the site's 220 acres, 28.9 acres are wetlands of medium to high quality, mostly
contiguous to Joe's Branch. CSF proposed to clear and fill 13.4 of these 28.9 wetland
acres. (AR Vol. II, Tab 59, pp. 0718-20).

6.      The development site has "steep slopes of rolling hills and coastal ravines."
The site is bisected by 4,069 feet of an ill-defined creek known as Joe's Branch and
further cut by a 550-foot tributary of the same stream.  Joe's Branch is a perennial braided
stream[2] that varies between somewhat defined to ill-defined channels.  The upper reaches
of the stream have been highly impacted by siltation from a power line right-of-way with
severe erosion gullies. (AR Vol. I, Tab 7, pp. 0116-18; Tab 59, p. 0718).  Joe's Branch
runs south and southwest through the property. (AR Vol. I, Tab 2, p. 0067). CSF planned
to bridge needed road crossings of Joe's Branch.  Since, however, there was the
possibility that there might be associated impacts to the stream, the CSF asked the Corps
to treat these road crossings as impacted areas.  The Corps evaluated impacts to 450 linear
feet of stream.  Some 28.9 acres of wetlands were also located on the development site,
mostly associated with Joe's Branch and its tributary.  Below the development site, Joe's
Branch flows under Interstate 10 and enters D'Olive Creek, which then flows into Mobile
Bay. (AR Vol. I, Tab 2, pp. 0035, 0037 and 0068-0069; AR Vol. II, Tab 59, p. 0720).

---

[2]Perennial streams are ones that contain flowing water through most of the year.
Www.soil.ncsu.edu/publications/BMPs/glossary.html.

7.      CSF's efforts to bring a large-scale, controlled development to this site first formally involved the Corps on or about March 8, 2004, when the Corps confirmed to Thompson Engineering, CSF's consultant, that the future site of the Spanish Fort Town Center indeed contained wetlands and other so-called "waters of the United States" within the Corps' regulatory jurisdiction. (AR Vol. I, Tab 1, p. 0001).

8.      The determination that the site contained wetlands signaled the implication of a variety of federal and state statutes and regulations, including the CWA and NEPA and its implementing regulations. *See*, 33 U.S.C. § 1251, *et seq.*; 42 U.S.C. § 4321, *et seq.*

## B.  Regulatory and Legal Background

9.      The CWA establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  In order to construct this Project, CSF is required to obtain three (3) separate CWA permits: (1) a CWA § 401 permit, commonly referred to as the water quality permit; (2) a CWA § 402 permit, commonly referred to as the storm-water permit; and (3) a CWA § 404 permit, commonly referred to as the dredge and fill, or wetlands permit. Of these three CWA permitting programs (§§ 401, 402 and 403), Congress assigned administration of only one, the CWA § 404 permit program, to the Corps. The other two permitting programs (CWA §§ 401 and 402) are administered by the states, in this instance by the Alabama Department of Environmental Management ("ADEM"). D'Olive challenges only the CWA § 404 permit issued by the Corps, not the CWA §§ 401 and 402 permits issued by ADEM to CSF.

10.    To achieve the goal of protecting the nation's waters, the CWA prohibits

the discharge of pollutants, which include dredged or fill material, into navigable waters,

unless that discharge is authorized by the grant of a CWA § 404 permit by the Corps. 33

U.S.C. § 1311(a).  The Corps may issue individual, general or nationwide permits. 33

U.S.C. § 1344(a), (e); 33 C.F.R. 320.1(c). This Project required an individual permit.  An

individual permit is issued on a case-by-case basis after a resource-intensive review that

involves extensive site-specific documentation, a public interest review, and formal

determinations as to environmental impacts of proposed actions. 33 C.F.R. Parts 320-331.

11.    In conducting the public interest review for an individual permit, the Corps

is to balance "benefits which reasonably may be expected to accrue from the proposal"

against the proposal's "reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1);

*Shoreline Assocs. v. Marsh*, 555 F. Supp. 169, 178 (D. Md. 1983), *aff'd without opinion*,

725 F.2d 677 (4th Cir. 1984).  Neither a proponent nor opponent of a project, the Corps is

to grant a permit application "unless the district engineer determines that [to do so] would

be contrary to the public interest." 33 C.F.R. § 320.4(a)(1).

12.    In the evaluation of every permit, the regulations provide that the Corps is

to consider these criteria: "(i) The relative extent of public and private need for the

proposed structure or work; (ii) Where there are unresolved conflicts as to resource use,

the practicability of using reasonable alternative locations and methods to accomplish the

objective of the proposed structure or work; and (iii) The extent and permanence of the

beneficial and/or detrimental effects which the proposed structure or work is likely to

have on the public and private uses to which the area is suited." 33 C.F.R. § 320.4(a) (2).

Additionally, all permits are to contain such special conditions as are necessary to satisfy

applicable statutory and public interest requirements. 33 C.F.R. §§ 325.4(a)(1)(c).

13.     CWA § 404 permits must also meet the 404(b)(1) Guidelines issued by

EPA and the Corps. 33 U.S.C. § 1344(b)(1).  *See*, 33 U.S.C. § 1344(e)(1). These

Guidelines are codified at 40 C.F.R. Part 230 and specify that federal agencies must

ensure that proposed actions (including activities it authorizes by permits) will not cause

significantly adverse effects on human health or welfare, aquatic life, and aquatic

ecosystems.[3]  40 C.F.R. § 230.10(c)(1)-(3).  The regulations for the Corps' permitting

program specifically provide that all CWA § 404 permits must meet these Guidelines. 33

C.F.R. § 320.4(b)(4). For every permit action, the Corps must then make a written

determination of the effects of a proposed activity "on the physical, chemical, and

biological components of the aquatic environment." 40 C.F.R. § 230.11.

14.     An important consideration under the 404(b)(1) Guidelines is the

alternatives analysis.  The Guidelines provide that "no discharge of dredged or fill

material shall be permitted unless appropriate and practicable steps have been taken

which will minimize potential adverse impacts of the discharge on the aquatic

ecosystem." 40 C.F.R. § 230.10(d). The Guidelines generally prohibit the permitting of

_____

[3]The term "aquatic ecosystem" is defined to mean "waters of the United States, including
wetlands that serve as habitat for interrelated and interacting communities and populations of
plants and animals."  40 C.F.R.  § 230.3(c).

projects where there "is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a); *see also,* 33 C.F.R. § 320.4(a)(2)(ii). In fact, unless a project requires access or siting within a special aquatic site to fulfill its basic purpose, or is "water dependent", there is a presumption that there is a practicable alternative that does not impact waters of the United States. 40 C.F.R. § 230.10(a)(3). As previously noted, the Corps' public interest review also requires it to consider practicable alternatives: "the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work." 33 C.F.R. 325.4(a)(1)(c). To be "practicable," an alternative must be "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2); 33 C.F.R. § 325, Appendix B (9)(b)(5).

15.   The permit application evaluated by the Corps in this case was from a private enterprise for a commercial development on private property. It is significant to distinguish, particularly in relevant case law, the alternatives analysis in this context from an alternatives analysis undertaken by the Corps in its operations of its Civil Works project, or projects and activities funded and authorized by Congress. Businesses and individuals for private development on private property come to the Corps for a CWA § 404 permit with a specific commercial enterprise planned. Nevertheless, the Corps is not to blindly accept the applicant's statement of project purposes. *See e.g.*, *Alameda Water*

*& Sanitation Dist. v. Reilly*, 930 F. Supp. 486, 492 (D. Colo. 1996). However, neither is it appropriate for the Corps to ignore an applicant's stated project purpose. *Sylvester v. U.S. Army Corps of Eng'r*, 882 F.2d 407, 409 (9th Cir. 1989). "Under these [§ 404] Guidelines, therefore, … the Corps has a duty to take into account the objectives of the applicant's project. Indeed, it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable." *Louisiana Wildlife Federation v. York*, 761 F. 2d 1044, 1048 (5th Cir. 1985). "The Corps is not a business consulting firm. It is in no position to conduct a feasibility study of alternative sites . . ., a study that would have it both evaluate the applicant's business needs and determine the availability of the necessary permissions from the owners of the riparian land at the various sites." *River Road Alliance v. U.S. Army Corps of Eng'r*, 764 F. 2d 445, 452-3 (7th Cir. 1985), *cert. denied*, 475 U.S. 1055 (1986). "When a private enterprise makes application for a permit, it will generally be assumed that appropriate economic evaluations have been completed, the proposal is economically viable, and is needed in the marketplace." 33 C.F.R. § 320.4(q).

16.     There are two other CWA permits CSF was required to obtain for this Project: a CWA § 401 water quality permit and a CWA § 402 storm-water permit. In Alabama, neither is issued by a federal agency, but rather are issued by a state agency, ADEM. This state agency is given the authority to certify, conditionally certify, waive, and deny that federal activities, including activities permitted under the CWA § 404 program, comply with water quality requirements. 33 U.S.C. 1341(a)(3). The Corps'

regulations for issuance of CWA § 404 permits acknowledges the important role played by the state agencies under the Clean Water Act.  The regulations recognize that the primary responsibility for evaluation of water quality issues was given by Congress in the CWA to the state certification program, the one in this case run by ADEM:

> [T]he Clean Water Act assigns responsibility for the control of non-point sources of pollution to the states. *A certificate of compliance with applicable effluent limitations and water quality standards required under Section 401 of the CWA will be considered conclusive with respect to water quality considerations* unless the Regional Administrator, Environmental Protections Agency, advises of other water quality aspects to be taken into consideration.

33 C.F.R. §320.4(d)(emphasis added).

17.    The Corps' CWA § 404 permit, therefore, cannot be issued until ADEM grants or waives water quality certification.  Denial by ADEM of the CWA § 401 permit results in a denial by the Corps of the CWA § 404 permit.  33 U.S.C § 1341(a); 33 C.F.R. 320.4(j); 33 C.F.R. 325.2(b).

18.    ADEM § 401 water quality certifications, like Corps CWA § 404 permits, are usually granted by ADEM conditionally.  Any condition ADEM attaches to its water quality certification must be incorporated into the Corps CWA § 404 permit.  33 U.S.C. § 1341.  The CWA § 401 permit issued by ADEM to CSF for this Project included 22 special conditions, (AR Vol. I, Tab 36, pp. 0366-71).  Each of these 22 conditions is a condition of the Corps permit issued to CSF in this case.  (AR Vol II, Tab 61, p. 0792, General Condition 5).

19.     NEPA's procedural requirements overlay and intertwine the Corps' section 404 permitting process.  NEPA requires "all agencies of the Federal Government" to:

> [I]nclude in every recommendation or report on proposals for …
> major Federal actions significantly affecting the quality of the human
> environment, a detailed statement by the responsible official on (i)
> the environmental impact of the proposed action, (ii) any adverse
> environmental effects which cannot be avoided should the proposal
> be implemented, (iii) alternatives to the proposed action, (iv) the
> relationship between local short-term uses of man's environment and
> the maintenance and enhancement of long-term productivity, and (v)
> any irreversible and irretrievable commitments of resources which
> would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C).  In enacting NEPA, Congress was concerned with the potential impacts of major federal actions significantly affecting the physical environment. *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772-73 (1983).  The purpose and intent of NEPA is to focus the attention of the federal government and the public on a proposed action so that the consequences of the action can be studied before the action is implemented and potential negative environmental impacts can be avoided.  42 U.S.C. § 4321; 40 C.F.R. § 1501.1(c).  *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989).  NEPA provides for a process designed to "identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment."  40 C.F.R. § 1500.2(e).  The Council on Environmental Quality ("CEQ") has promulgated regulations to implement NEPA.  40 C.F.R. §§ 1500.1 et seq.  The Corps has promulgated specialized NEPA regulations that supplement the CEQ regulations in

12

order to implement NEPA in the operation of the Corps' CWA § 404 permitting program. These are found at 33 C.F.R. Part 325, Appendix B.

20.     NEPA requires federal agencies to consider impacts of major actions, including issuance of CWA § 404 permits by the Corps, on the human environment. The agency documents its NEPA compliance by the preparation of a statement analyzing the possible environmental consequences of the proposed activity for which a permit is sought. 42 U.S.C. § 4332(c).  Not every federal action, or federal permit issued, however, requires preparation of an EIS.  Where the environmental impacts of an action are less than significant, an agency may comply with NEPA through preparation of an EA and a FONSI.  *See*, 40 C.F.R. §§ 1501.3; 1501.4(c), (e); and 1508.9; 33 C.F.R. § 325 App. B. An EA provides sufficient evidence and analysis for determining whether an action has significant environmental impacts, including "discussions of the need for the proposal, of alternatives . . ., [and] of the environmental impacts of the proposed action and alternatives. . . ."  40 C.F.R. § 1508.9.  Most CWA 404 permits do not require an EIS but, instead, only require an EA. 33 C.F.R. § 230.7 ("Actions normally requiring an EA, not an EIS, [include] [r]egulatory [a]ctions. Most permits will normally require only an EA.").

21.     In addition to NEPA analysis, all Corps' permitting processes, including that for wetlands, are subject to a "public interest review" – a review that encompasses an evaluation of the "probable impacts, including cumulative impacts," of the permitted activity, and the effects on "the public interest." See 33 C.F.R. § 320.4(a); 33 C.F.R. §

320.4(a)(1).  A broad range of potential impacts are implicated in the public interest

review, including "conservation, economics, aesthetics, general environmental concerns,

wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values,

land use, navigation, shore erosion and accretion, recreation, water supply and

conservation, water quality, energy needs, safety, food and fiber production, mineral

needs, considerations of property ownership and, in general, the needs of the people."

*See*, 33 C.F.R. § 320.4(a)(1).

      22.    The Corps must also consider the "relative extent of the public and private

need" for the proposed action; the "practicability" of alternatives, if "there are unresolved

conflicts as to resource use"; and "[t]he extent and permanence of the beneficial and/or

detrimental effects which the proposed structure or work is likely to have on the public

and private uses to which the area is suited." *See*, 33 C.F.R. § 320.4(a)(2).

      23.    The Corps must also weigh "the benefits which reasonably may be expected

to accrue from the proposal" against "its reasonably foreseeable detriments."  *See*, 33

C.F.R. § 320.4(a)(1).  The analysis determines "whether to authorize a proposal, and if so,

the conditions under which it will be allowed to occur."  *See*, 33 C.F.R. § 320.4(a)(1).

      24.    For most Corps permits, a presumption exists that "a permit will be granted

unless the district engineer determines that it would be contrary to the public interest."

*See*, 33 C.F.R. § 320.4(a)(1).  On the other hand, however, the Corps' regulations for

section 404 permits for the fill of wetlands make clear that "[m]ost wetlands constitute a

productive and valuable public resource, the unnecessary alteration or destruction of

which should be discouraged as contrary to the public interest." *See*, 33 C.F.R. §

320.4(b)(1).

25.    If the wetlands at issue are deemed "important," then the Corps may not

issue a permit unless the district engineer concludes that the benefits of the proposed

alteration outweigh the damage to the wetlands resource," taking into account the factors

considered in the public interest review. *See*, 33 C.F.R. § 320.4(b)(4).

### C.  The Permitting Process

26.    Prior to submitting its application for a § 404 permit, Thompson

Engineering ("Thompson"), CSF's consultant,  met with the Corps, the U.S. Fish &

Wildlife Service ("FWS"), and the Alabama Department of Environmental Management

("ADEM") on May 10, 2004, in a pre-application meeting intended to discuss permitting

options and issues associated with the development site. (AR Vol. I, Tab 2, p. 0009).

27.    After its initial identification of the site for potential development, CSF's

traffic study consultant began to develop a plan, in coordination with the Alabama

Department of Transportation ("ALDOT"), to assess the potential impact of the site's

development on local traffic.  (AR Vol. II, Tab 55, pp. 0505-0507).

28.    CSF's consultant's initial communications with ALDOT took place as early

as July 19, 2004, with a study being completed on November 23, 2004, an executive

summary of the same being generated on June 13, 2005, and additional communications

with ALDOT occurring in the interim. (AR. Vol. II, Tab 55, pp. 0505-0705).

29.     Prior to or contemporaneous with the pre-application meeting, CSF decided to forgo developing the entire 220-acre parcel and instead elected to develop only a limited portion of the site.  The revised plan envisioned filling only 13.4 acres of wetlands and 450 linear feet of creek. (AR Vol. I, Tab 2, p. 0034; Vol. I, Tab 5, p. 0080).

30.     On June 18, 2004, Thompson submitted, on CSF's behalf, a "Joint Application and Notification" to the Corps and ADEM for the required permit.  (AR Vol. I, Tab 2, p. 0009-24).[4]

31.     CSF submitted an alternative analysis along with the permit application. The alternatives analysis reiterated the project's purpose and detailed the considerations factoring into selection of the proposed project and the rejection of other alternative locations (including locations farther afield than south Alabama).[5]  (AR. Vol. I, Tab 2, pp. 0024-0038).

_____

[4]In Alabama, the Corps must obtain a certification from ADEM that the project complies with state water quality and coastal zone management requirements. *See*, 33 U.S.C. § 1341(a)(1) (requiring an applicant for a federal permit to obtain a certification of compliance with water quality requirements); 15 U.S.C. § 1456(c)(3)(A) (requiring an applicant for a federal permit activity affecting the land, water or natural resources of the coastal zone of a state with an approved coastal zone management plan to obtain a certification of compliance with coastal zone management requirements). Here, because the development site is located in Alabama's coastal zone, a joint application was submitted.

[5]CSF's alternative analysis recognized that the Mobile Bay area provided a likely customer base for Bass Pro Shops.  It also recognized, however, that for Bass Pro Shops to fully pursue a retail opportunity in that area, it would require a site that (i) provided at least 200 acres; (ii) possessed direct visibility from Interstate 10 with direct access from an existing interchange and high volume traffic; (iii) was located in a municipality with a favorable tax structure (i.e., able to establish a Cooperative Improvement District); (iv) with an affluent population density; (v) strategically sited between existing Bass Pro Shops stores in Bossier City, Louisiana, and Destin, Florida; (vi) within thirty minutes of prime hunting and fishing locations; and (vii) possessing minimal requirements for public road improvements.  (AR Vol. I, Tab 2, p. 0031).

32.    The Corps issued a public notice with respect to CSF's permit application and solicited comments from the public on July 8, 2004. (AR Vol. I, Tab 5, p. 0080).

33.    The Corps' public notice identified both the direct impact of the work on waters of the United States ("to clear and fill 13.4 acres of forested wetland and fill 450 linear feet of perennial streambed") and the proposed mitigation for the same ("to purchase credits from an approved wetland mitigation bank" and to "preserve the remaining 4,069 linear feet of stream on site in a buffer ranging from 100 to 200 feet wide"). (AR Vol. I, Tab 5, p. 0080).

34.    The public notice also emphasized the importance of the public providing comments and information related to the permit application and the Corps' related NEPA obligations:

> The Corps is soliciting comments from the public; Federal, State, and local agencies and officials; Indian tribes; and other interested parties in order to consider and evaluate the impacts of this proposed activity. Any comments received will be considered by the Corps to determine whether to issue, modify, condition, or deny a permit for this proposal. To make this decision, comments are used to assess impacts on endangered species, historic properties, water quality, general environmental effects, and the other public interest factors listed above. Comments are used in the preparation of an Environmental Assessment and/or an Environmental Impact Statement pursuant to [NEPA]. Comments are also used to determine the need for a public hearing and to determine the overall public interest of the proposed activity.

(AR. Vol. I, Tab 5, p. 0081).

35.     D'Olive offered no comments, questions, or complaints during the notice's comment period or at any time during the Corps' subsequent year-long consideration of the permit application. *See*, Plaintiff's Complaint for Declaratory and Injunctive Relief, p. 3; AR, *supra*.

36.     Other members of the public and various state and federal agencies offered a variety of comments during the initial public comment period. (AR Vol. I, Tabs 9-19, pp. 0137-0158).

37.     Federal resource agencies such as the FWS and the EPA submitted comments and asked questions. (AR Vol. I, Tabs 12 and 15, pp. 0140-0143, 0149-0151).

38.     During the comment period, a site visit occurred on July 12, 2004, during which representatives of Thompson, the Corps, ADEM, and FWS visited the development site and discussed environmental issues associated with the permitting. (AR Vol. I, Tab 15, p. 0149).

39.     These regulatory agencies recognized that the site posed challenges for the development and that "problems with the application would include the potential for siltation and erosion resulting from the construction and required earth moving, as well as contaminated runoff after construction. ADEM was identified as the agency responsible for implementing water quality control measures." (AR Vol. I, Tab 7, p. 0013).

40.     In the wake of the public comment period and the July 12, 2004, site visit, the Corps corresponded with Thompson on August 16, 2004, and shared the various resource agencies' comments. (AR Vol. I, Tab 21, p. 0177).

41.     Thompson participated in another interagency meeting on November 5, 2004, with the Corps, FWS, and ADEM. (AR Vol. I, Tab 29, p. 0241).

42.     The interagency dialogue culminated, to a large extent, on February 7, 2005, when Thompson provided the Corps with a revised alternatives analysis, revised mitigation plan, revised alternatives matrix, and the site's Best Management Practices Report and Erosion Control Plans. (AR Vol. I, Tab 34, p. 0254).

43.     The Corps continued to discuss with CSF the alternatives analysis. (AR Vol. I, Tabs 21 and 26, pp. 0177-0190, 0198-0203).

44.     Other agencies also required a harder look at whether practicable alternatives to the site existed, both in terms of examining other sites and examining whether less impact on-site was practicable.  EPA suggested site design changes or reconfigurations to minimize the amount of wetlands impacts. (AR Vol. I, Tab 12, pp. 0140-0143).  FWS encouraged consideration of other sites and also suggested on-site reconfiguration to minimize impacts.  (AR Vol. I, Tab 15, pp. 0149-0152).

45.     After receiving the agencies' comments, CSF submitted a detailed matrix of the five sites which further explained why other sites were not practicable. (AR. Vol. I, Tab 30, pp. 0246-0250).

46.     Additionally, CSF analyzed the utility of the on-site alternative of the use of a parking deck or otherwise terraced parking arrangements, finding that such a parking plan would be unacceptable to the development's retail tenants. Thompson wrote: "[T]he retailers seek ease of access to their respective stores from the major roads and free-

19

flowing traffic patterns within the shopping center compound." Thompson explained

further that terracing the site would "disrupt site lines and ease of movement across the

site [funneling of traffic], would cause the use of significant sloped areas thereby

reducing the overall developable footprint of the project, or would lead to the utilization

of vertical, reinforced earth or structural retainment systems that would significantly

increase the site development cost." (AR Vol. I, Tab 30, p. 0249).

47.    Subsequent correspondence provided even more information and revisions

to the alternatives analysis, including a revised "development objective" that more clearly

outlined overall project purposes.  The revised objective declared that CSF's objective

was to "locate and construct a multi-tenant shopping mall having a primary anchor tenant,

Bass Pro Shops, within Baldwin County with immediate access and high visibility to an

interstate highway and a high volume intersection." (AR Vol. I, Tab 34, pp. 0341-0356).

48.    The EPA was provided with CSF's revised Alternatives Analysis on May 3,

2005.  (AR Vol. II, Tab 47, pp. 0401-0427).   EPA never communicated with the Corps

further on this matter, nor did it elect to elevate the matter to higher headquarters.  *See*,

AR, *supra*.

49.    On March 18, 2005, ADEM issued the requisite CWA § 401 Water Quality

Certification and Coastal Consistency Certification to the Corps for the proposed project.

(AR Vol. I, Tab 36, pp. 0366-0371). Such certification followed CSF's registration, on or

about February 9, 2005, with ADEM's stormwater regulation program – a registration

that memorialized CSF's commitment and obligation to comply with ADEM's

stormwater regulations at the development site during construction. (AR Vol. I, Tab 42, p. 0393).

50.     The certification letter identified twenty-two conditions to be incorporated as part of the permit. The conditions included, but were not limited to, implementation of a Construction Best Management Practices Plan ("CBMPP") to control stormwater, the development of a turbidity monitoring plan, daily site inspection of the area of active disturbance, weekly comprehensive site inspections by qualified professionals, monitoring and compliance with turbidity limitations in any receiving waters, an obligation to halt work should uncontrolled discharges occur, submission of implementation/construction reports to ADEM, and the maintenance of the proposed buffer strip along Joe's Branch. (AR Vol. I, Tab 36, pp. 0366-0371). "If conducted in accordance with the conditions prescribed herein," the certification letter read, "ADEM hereby issues official certification … that there is a reasonable assurance that the discharge resulting from the proposed activities as submitted will not violate applicable water quality standards …" (AR Vol. I, Tab 36, p. 0370).

51.     This § 401 certification was a critical document in that, as noted by the resource agencies in their site visit of July 12, 2004, "ADEM was identified as the agency responsible for implementing water quality control measures." (AR Vol. I, Tab 7, p. 0113).

52.     In the interim, the Corps and Thompson continued to discuss CSF's proposed mitigation plan, particularly with regard to erosion control, as evident in letters

21

from Thompson to the Corps dated March 24, 2005, and April 19, 2005.  (AR Vol. I, Tabs 38 and 41, pp. 0378-0379, 0387-0391).

53.    An internal Corps' memorandum, dated April 29, 2005, evidences the Corps' conclusion regarding that matter.  That letter states: "Adherence by the applicant to the requirements of ADEM permits, and the incorporated Alabama Handbook [for Erosion Control] and applicable Alabama law, should provide for adequate erosion control measures for the project."  (AR Vol. I, Tab 45, p. 0397).

54.    Throughout its evaluation of CSF's application for a CWA § 404 permit, the Corps coordinated its review and consulted with numerous federal and state agencies, each charged with protection of a particular national or state environmental concern.  In addition to ADEM, it consulted with U.S. Fish & Wildlife Service, U.S. Environmental Protection Agency, U.S. National Marine Fisheries Service, Alabama Historical Commission-State Historic Preservation Office, and Alabama Department of Conservation and Natural Resources.  Each agencies' concerns and issues were fully considered and resolved by the Corps during the permit evaluation process.  Significantly, after having evaluated information regarding the Project and the expected environmental impacts of concern to the particular agency, not one of these agencies objected to the issuance of a Corps CWA § 404 permit to CSF.

a.    **U.S. Fish & Wildlife Service ("FWS")**

55.    FWS's primary concerns were with regard to the construction causing erosion and sediment run-off that might result in the siltation of downstream waters and

thereby potentially impact the endangered Alabama red-bellied turtle.  No other species of concern were noted by FWS.  (AR Vol. I, Tab 15, pp. 0149-52).  In its written comments FWS noted its concerns about erosion from other large scale developments in the project vicinity which had in the past caused water quality problems, and the potential threat posed by this Project.  FWS asked to review CSF's Best Management Practices ("BMP") and stormwater control plans.  (AR Vol. I, Tab 39, pp. 0380-81).  It asked the Corps not to issue a permit until its concerns were addressed.  (AR Vol. I, Tab 15, p. 0152; AR Vol. I, Tab 39, p. 0381).  The Corps provided CSF's BMP and Erosion Control Plans to FWS on April 6, 2005.  (AR Vol. I, Tab 40, pp. 0382-88).[6]  The same date CSF sent a letter to FWS addressing their specific concerns.  (AR Vol. I, Tab 40, pp. 0382-86). This information on CSF's BMP and mitigation plans resolved FWS's concerns. FWS then informed the Corps:

> We believe the applicant has provided a plan that will contain the sediment on-site and very minimal impacts will occur to aquatic resources in D'Olive Creek and Joe's Branch.  Our initial concerns were directed at potential adverse impacts to the Alabama red-bellied turtle (Pseudemys alabamenis), a federally protected species.  If the plans submitted are implemented, we believe no adverse impacts to this species are likely to occur.

(AR Vol. II, Tab 54, pp. 0495-97).  By letter dated May 20, 2005, FWS specifically withdrew its previous objections to issuance of the permit. (AR Vol. II, Tab 54, pp. 0496-99).

---

[6]The plans include numerous drawings which are made a part of the AR at Tab 65, but are oversized and were provided to the Court separately from the binders.

**b.**     **U.S. Environmental Protection Agency ("EPA")**

56.     The EPA focused its comments on ensuring Corps compliance with the §

404(b)(1) Guidelines, which are promulgated jointly by EPA and the Corps. The EPA

expressed concerns about stormwater run off and potential problems with water quality if

there were siltation in downstream waters. (AR Vol. I, Tab 12, pp. 0140-42).   The EPA

asked for a thorough review of CSF's alternatives, as well as its mitigation plans. These

were provided to EPA on May 3, 2005. (AR Vol. II, Tab 47, pp. 0401-26).   After this

date, no further EPA comments, including objections, were received by the Corps.   In

their initial comment letter, EPA retained the option to elevate the permit decision for

higher level agency review with the EPA Regional Administrator in accordance with 33

U.S.C. § 1344(q) and the 1992 Memorandum of Agreement Part IV 3(a).  (AR Vol. I, Tab

12, p. 0142).[7]   In addition, the EPA always has the authority to veto issuance of any Corps

permit or otherwise make an official determination that the discharge of fill material on

this site would have an "unacceptable adverse effect."  40 C.F.R. § 231.1(a).   In this case

the EPA made no other determinations regarding this permit.  It did not elect to veto or

seek higher level review of the Corps' decision to issue a CWA § 404 permit to CSF for

this Project.

---

[7]A copy of the MOA can be found at www.epa.gov/owow/wetlands/regs/dispmoa.

### c.     **National Marine Fisheries Service ("NMFS")**

57.    This agency stated that the Project could adversely impact fishery resources and directed the Corps to consider the comments of FWS as the comments of NMFS. (AR Vol. I, Tab 18, p. 0157). No further comments were received from NMFS, and the FWS concerns were fully resolved before the Corps issued a permit. (AR Vol. II, Tab 54, pp. 0496-99).

### d.     **Alabama Historical Commission-State Historic Preservation Office ("AHC-SHPO")**

58.    The Corps coordinated this permit action with AHC-SHPO. No properties eligible for the National Register of Historic Properties are located on CSF's project site. (AR Vol. I, Tab 22, p. 0191). Phase I and II cultural resource investigations were conducted at CSF's direction during which nails, Euro-American ceramics and glass were found. Because the site has been heavily impacted by previous disturbances, the construction of I-10, and relic hunters, AHC-SHPO did not require further cultural resources monitoring and mitigation. (AR Vol. I, Tab 24, p. 0193). A condition of all Corps permits, and this one, is that if previously unknown historic remains are discovered, the Corps is to be immediately notified and the action coordinated with AHC-SHPO. (AR Vol. II, Tab 61, p. 0792, General Condition 3). Therefore, all the concerns of this agency were resolved before permit issuance. (AR Vol. I, Tab 24, p. 0193; Tab 33, p. 0253).

**e.   Alabama Depatment of Conservation & Natural Resources ("ACDNR")**

59.     This agency requested that the Corps undertake an EA, and emphasized the importance of BMPS.  (AR Vol. I, Tab 16, p. 0153).   On May 3, 2005, the Corps provided ACDNR a copy of the alternatives analysis and mitigation plan.  (AR Vol. II., Tab 49, pp. 0454-79).  No further comment, including any objection, was received from ACDNR with regard to this project.

**Public Involvement**

60.     A Public Notice was issued jointly with ADEM on July 8, 2004. (AR Vol. I, Tab 5, pp. 0080-85).  Numerous comments on this permit action were received by the Corps from members of the public, most notably Mr. Rob Fisher of Ecological Conservation Organization (ECO) of Little Rock, Arkansas. (AR Vol. I, Tab 25, pp. 0194-97; Tab 28, pp. 0233-39; Tab 58, pp. 0708-712).[8]  His comments were referenced in letters received from Bay Area Responsible Growth Alliance (BARGA)(AR Vol. I, Tab 43, p. 0394; Tab 46, pp. 0398-400),[9] and the Alabama League of Environmental Action

---

[8]Mr. Fisher is a named Plaintiff in a lawsuit filed against the Corps challenging issuance of a CWA § 404 permit for a large shopping mall in Arkansas in which the major store is also a Bass Pro Shop. *See*, *Arkansas Nature Alliance, Inc., et al. v. Army Corps of Engineers, et al.*, Civil Action No. 4:05CV00622 (E.D. Ark. 2005).  This case was dismissed on May 9, 2006 for lack of standing.

[9]Suit was initially filed against the Corps regarding issuance of this permit in 2005.  *Bay Area Responsible Growth v. United States Army Corps of Engineers*, Civil Action No. 05-00423 (S.D. Ala. 2005).  This suit was voluntarily dismissed by the Plaintiffs after issues of standing were raised.)

Voters.  (AR Vol. I, Tab 44, p. 0395).  Pursuant to the Freedom of Information Act

("FOIA"), the Corps periodically provided Mr. Fisher with documents related to its

ongoing evaluation of this permit application.  (AR Vol. II, Tab 64, pp. 0836-84).  These

members of the public expressed opposition to issuance of a Corps permit to CSF, and

urged the Corps to undertake an EIS before making a permit decision.

61.    Comments were also received from the Eastern Shawnee Tribe, who

expressed no opposition to the Project. (AR Vol. I, Tab 9, p. 0137).  Plaintiff in the

instant case did not comment on the Project.  There was no request for a public hearing on

this permit action.

**Alternatives Analysis**

62.    A significant task for the Corps in the evaluation of this permit was the

required alternatives analysis.[10]  The Corps' decision documents consist of the Statement

of Findings, Environmental Assessment, and the 404(b)(1) Guideline Evaluation. (AR

Vol. II, § 59, pp. 0713-66).   These documents contain a  summary of the intensive review

given by the Corps to evaluation of alternatives for this Project. Only the water quality

issues rivaled the alternatives issues in the attention received in Corps' evaluation of this

permit application.

_____

[10]This project is not "water dependent" and so under the 404 (b)(1) Guidelines, there is a
presumption that there is a practicable alternative not involving impacts to waters of the United
States. 40 C.F.R. 230.10(a)(3)

63.    An initial alternatives analysis was provided by CSF with the application on

June 21, 2004.  (AR Vol. I, Tab 2, pp. 0024-64).  After receiving and considering

comments on the proposed project by the resource  agencies and the public, the Corps

requested that CSF provide additional information with regard to practicable alternatives.

CSF submitted additional materials to the Corps on three separate occasions: October 4,

2004 (AR Vol. I, Tab 27, pp. 0204-232), November 18, 2004 (AR Vol. I, Tab 30, pp.

0246-250), and February  3, 2005 (AR Vol. I, Tab 34, pp. 0341-356).

64.    CSF's stated objective for the Project is to construct a shopping mall with

Bass Pro Shops as the anchor and primary tenant. (AR Vol. I, Tab 2, p. 0027).

Preliminarily, the CSF site assessment team considered potential locations along a broad

band of the Interstate 10 corridor, from West Florida through coastal Mississippi. (AR

Vol. I, Tab 2, p. 0031).  For reasons repeatedly articulated in documents submitted to the

Corps, CSF's preferred location, based on its market and economic analysis, was the

Alabama coast, with high visibility from Interstate 10.  It narrowed the site search and in

its alternatives analysis of February 3, 2005, provided seven criteria against which it

evaluated five sites in Mobile and Baldwin Counties. (AR Vol. I, Tab 34, pp. 0341-56).

65.    In the final analysis, CSF demonstrated to the Corps' satisfaction the need

to locate their project in the fast growing Baldwin County market.  The Corps then

evaluated direct, indirect, and cumulative impacts for the three different Baldwin County

sites.  These sites were the northeast corner of Interstate 10 and Malbis, the southwest

corner of Interstate 10 and Malbis, and CSF's preferred site at the northeast corner of

Interstate 10 and U.S. Highway 98.  These sites were evaluated on twelve separate criteria: 1) visibility from Interstate; 2) intersects major road; 3) traffic counts; 4) potential for retail/entertainment; 5) wetlands; 6) cultural resources; 7) on-site mitigation potential; 8) site availability; 9) acreage; 10) competition; 11) lessee potential; and 12) on-site erosion potential.  (AR Vol. II, Tab 59, pp. 0741-42).   After a close evaluation of all impacts, CSF's preferred alternative (and permitted Project) was determined by the Corps to be the least environmentally damaging practicable alternative. (AR VOL. II, Tab 59, pp. 0743-59).

### Erosion & Sediment Run-Off

66.     The federal and state resource agencies, as well as the members of the public commenting on this project, repeatedly urged the Corps to focus its attention on the potential for erosion and sediment run-off from the site during the construction process which might cause downstream water quality problems.  Even though a water quality certification was issued by ADEM, and even though the Corps regulations provide that ADEM's certification is to be "considered conclusive with respect to water quality consideration" by the Corps, 33 C.F.R. § 320.4 (d), the Corps gave consideration to the recommendations from the resource agencies and the public.  It gave this issue very close scrutiny. Among other actions, it required CSF to provide its BMP and stormwater management plans for intensive Corps review, and CSF did so by letter dated February 7, 2005.  (AR Vol. I, Tab 34 and Tab 65: oversized drawings).

29

67.     To ensure that the Corps had a fully informed understanding of the proposed action and its potential environmental impacts on water quality, the staff of the Regulatory Division engaged the specialized technical expertise of the Corps' Engineering Division.  The Chief of the Corps' Engineering Division and the lead hydraulic engineer in the Coastal, Hydrology and Hydraulic Design Section reviewed CSF's BMP and Erosion Control Plans, its CWA § 401 water quality certification issued by ADEM, and its Notice of Registration for the CWA § 402 storm-water permit. (AR Vol. I, Tab 35, pp. 0364-65; Tab 45, pp. 0396-97; Tab 59, p. 0725).  The Corps Permit Project Manager conducted several meetings with Corps engineers and CSF's engineers, and correspondence was also exchanged on this important issue.  (AR Vol. I., Tab 35, pp. 0364-65; Tab 38, pp. 0378-79; Tab 41, pp. 0387-91; and Tab 45, pp. 0396-97).

68.     Critical to the Corps' analysis and findings as to water quality in the EA and for the permit decision were the conditions ADEM placed on CSF in its CWA § 401 water quality certification for the Project.  (AR Vol. I, Tab 36, pp. 0368-71).  The CWA § 401 water quality permit issued by ADEM requires stringent Best Management Practices specifically developed for sites with steep topography and fragile soils, such as are found on this site. The permit also handles concerns about the potential for sediment to move off the site by requiring some unusually rigorous monitoring and reporting requirements.  For example, condition 4 requires CSF to conduct daily visual inspections where active disturbance, work or construction occurs. Condition 6 requires CSF to conduct weekly comprehensive BMP inspections, and to submit  inspection reports to ADEM on a

monthly basis.  Condition 7 establishes for the Project a qualitative performance standard

for turbidity.[11]  The certification also provided that if turbidity limits were exceeded,

operations are to cease and ADEM is to be notified.  Condition 9 requires CSF to submit

a turbidity monitoring plan for ADEM's approval.[12]  CSF provided this plan to ADEM on

May 10, 2005, and provided a copy to the Corps.  (AR Vol. II, Tab 50, pp. 0480-84).

Condition 10 requires a bi-weekly report to ADEM of CSF's turbidity data and records.

      69.    After a thorough examination and consideration of the potential impacts of

this project on water quality, the Corps concluded that CFS's BMPs and Erosion Control

Plans, in concert with the conditions in the certification provided by ADEM on water

quality,  were adequate to control sediment runoff and to maintain downstream water

quality.  The Corps, therefore, determined there would be no significant impacts from this

Project on water quality.  (AR Vol. II, Tab 59, p. 0728).

      70.    The Corps also considered the project's potential effects on air quality,

documenting such consideration in the EA on pages 9-10 and again on page 20,

---

[11]Turbidity is a principal physical characteristic of water and is an expression of its
clarity. Turbidity is caused by suspended matter or impurities that may include clay, silt, finely
divided inorganic and organic matter, soluble colored organic compounds, and plankton and
other microscopic organisms. Erosion and sediment run-off is a common source of turbidity.
(www.epa.gov/safewater/mdbp/pdf/turbidity/chap_07.pdf)  The ADEM standard provided:
"Turbidity impacts from project implementation shall not cause substantial visible contrast in
state waters a distance greater than 2.5 times the stream width from the cut or fill impact areas
and stormwater detention/retention structure outfalls, or result in an increase of 50
Nephelometric turbidity units (NTUs) above background turbidity levels."

[12]The plan is to include "visual monitoring of all stream reaches and implementation of
in-stream sampling as necessary during and after any precipitation event of 0.75 inch or greater
in an 24-hour period to determine compliance/non-compliance with the state turbidity standard."

concluding throughout that the project would cause no adverse effect on air quality.  (AR Vol. II, Tab 59, pp. 0724-0725 and 0735).

71.    The Corps also assessed the project's potential noise impacts due to increased traffic, particularly in light of the project's proximity to I-10.  (AR Vol. II, Tab 59, p. 0015).

72.    The Project's potential effects regarding its impact on children was examined, with the conclusion being "[t]he project site is not directly adjacent to any residential areas and the only ingress and egress to the site would be onto an existing four-lane highway." (AR Vol. II, Tab 59, p. 0018).

73.    A discussion of potential land use changes is found on page 6 of the EA. (AR Vol. II, Tab 59, p. 0721).  As that section notes, "[likely future] commercial development, whether or not similar to the proposed mall, and regardless of the degree of wetland or stream impacts subject to the Corps' jurisdiction, would likely result in a similar set of land use changes and impacts to the environment."  Further discussion of aesthetics is found on pages 14-15 of the EA.  (AR Vol. II, Tab 59, pp. 0729-0730). Another discussion of aesthetics is found on page 7 of the 404(b)(1) Guidance document. (AR Vol. II, Tab 59, p. 0760).

74.    As part of its consideration of the project's potential traffic impacts, the Corps consulted the November 23, 2004 traffic study (AR Vol. II, Tab 55, pp. 0500-0705), and engaged in communications with ALDOT.  (AR Vol. II, Tab 55, p. 0706).

Traffic is discussed in two separate sections of the EA.  (AR Vol. II, Tab 59, pp. 0730 and 0735-0737).  The following comments from the EA are examples of such consideration:

> "The increase in traffic would likely require new traffic signals and traffic lanes to efficiently route traffic in and out of the development. The long term, indirect traffic impacts caused by the proposed project may also be considered as cumulative impacts because they will ultimately be added to the current and future traffic from all sources.  (AR. Vol. II, Tab 59, p. 0730).

> "Entry to the proposed Spanish Fort Town Center would be via two intersections on U.S. 90. The southern entry would be located 900 feet north of the I-10 off-ramp and the northern entry would be 250 [feet] south of North Patrician Drive. An internal road system would connect the two entryways."  (AR. Vol. II, Tab 59, p. 0736).

> "By telephone conversation with Mr. Jackie Glasgow of ALDOT on 13 June 2005, he indicated that the proposed improvements would be adequate to manage the projected increases in traffic that would result from the project. He stated that the improvements could be contracted by the City of Spanish Fort, or ALDOT if State funds were available or if not, the developer would be required to construct the improvements under an ALDOT permit. Because there are no streams, wetlands or forested areas along U.S. 90/98, other than at the proposed mall site, such traffic improvements would not be expected to cause additional environmental impacts.  (AR Vol. II, Tab 59, pp. 0736-0737).

75.     The Corps memorialized its consideration of parking issues associated with the development in its EA. In the EA, it recognized that the construction of a parking garage "could reduce the footprint, thereby reducing the impact to wetlands.  However, it was not considered practicable since access, visibility, and safety are encumbered.  In addition, the alternative is considered impracticable because of an added estimated cost of $7,000 per parking space."  (AR. Vol. II, Tab 59, p. 0743).

33

76.    The potential cumulative effects of the project were considered on pages 19-22 of the EA.  (AR Vol. II Tab 59, pp. 0734-0737).  Further cumulative effects analysis can be found in the Section 404(b)(1) Guidance document.  (AR Vol. II, Tab 59, pp. 0763-0764).

### D.    The Permit

77.    On June 15, 2005, the Corps issued its Statement of Findings with respect to the proposed permit and the environmental assessment that accompanied it.  The Corps' District Engineer wrote that his finding "of this assessment is that the proposed activity does not constitute a major Federal action significantly affecting the quality of the National Environmental Policy Act of 1969.  I have concluded that the preparation of an Environmental Impact Statement for this project is not required."  (AR Vol. II, Tab 59, p. 0714).

78.    The Corps made similar favorable conclusions with respect to its section 404(b)(1) evaluation and, in the end, stated that "when the total adverse effects of the proposal are weighed against the benefits to the using public, issuing the permit would not be contrary to the public interest subject to the [enumerated] special conditions."  (AR Vol. II, Tab 59, pp. 0754-0766).

79.    The special conditions added to the section 404 permit evidence the Corps' concerns with respect to runoff, soil erosion, and water quality, and include:

•    Appropriate erosion and siltation controls in accordance with the Alabama Handbook for Erosion Control, Sediment Control and Storm Water Management on Construction Sites

and Urban Areas 2003 Edition, will be used and maintained in
effective operating condition during construction to prevent
siltation from entering adjacent water bodies and wetlands.

- The permittee must include and implement in the
  Construction Best Management Practices Plan the maximum
  diversion upgradient or offsite water flow to reduce erosion
  and migration of sediment.

- The permittee must meet the Alabama Handbook guidelines
  for providing and installing slope breaks to reduce erosion on
  long slopes.

- The permittee must follow the Alabama Handbook regarding
  temporary sediment traps, specifically that this practice is to
  be used at the outlet of runoff conveyance systems, and
  avoiding placement in locations where failure of the trap
  would result in hazard to the public or off-site property.

- The permittee shall be responsible for the cleanup and
  disposal of any eroded sediments originating from the project
  site that enter water bodies or wetlands, regardless of any
  weather condition.

- The permittee shall comply with local floodplain ordinances
  and regulations. Prior to Construction, you shall contact local
  designated responsible officials for any required floodplain
  permits.

(AR Vol. II, Tab 61, p. 0793).

80.     The EA attached to the Statement of Findings memorialized the Corps'

analysis of issues associated with endangered species, clean air, water

quality/downstream siltation, aesthetics, traffic, and noise.  (AR Vol. II, Tab 59, pp. 0722-

0723, 0724-0725, 0725-0730).  It also discussed the project's potential cumulative

effects.  (AR Vol. II, Tab 59, pp. 0734-0737).  Furthermore, it related the Corps' review

and analysis of the various alternatives to the proposed project.  (AR Vol. II, Tab 59, pp. 0738-0743).

81.    As a final measure, the Corps directly incorporated ADEM's Section 401 water quality certification's conditions into its permit.  (AR Vol. II, Tab 61, pp. 0792-0793).

82.    The Corps issued Permit AL04-01732-L to CSF on June 16, 2005.  (AR Vol. II, Tab 61, pp. 0790-0813.

**E.    Actions Subsequent to Issuance of the Corps Permit Challenged in this Case.**

83.    The Corps permit for which judicial review is sought here was issued on June 16, 2005.  (AR Vol. II, Tab 61, pp. 0790-813).  The subsequent permit application was filed on September 16, 2005, some three months later.  It seeks authorization to fill 1.08 acres of wetland on a 40-acre site adjacent to the 220-acre site, which is the subject of this action.  The Corps is currently evaluating this application and to date no permit has been issued.  (Exhibit II, Affidavit of Lewis C. Sumner, Corps Project Manger, Exhibit II to Federal Defendants Response to Plaintiff's Motion to Reconsider, Document 44-3).

84.    D'Olive sought to have the Court consider documents relating to this second application, matters that are not part of the Administrative Record.  CSF filed a Motion to Strike these materials, which was granted.  Following additional litigation, that Order was affirmed on May 17, 2006. (Doc. 46).  These post AR documents are thus not properly before the Court, and will not to be considered in this matter.

# CONCLUSIONS OF LAW[13]

## A.     Standard for Review of Final Agency Action.

1.     Judicial review of the Corps' issuance of a permit is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, *et seq*.  The APA compels the court to uphold the agency's action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  *See also*, *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971); *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998); *Arango v. United States Department of the Treasury*, 115 F.3d 922, 928 (11th Cir. 1997);  *Preserve Endangered Areas of Cobb's History, Inc.(PEACH) v. U.S. Army Corps of Eng'r*, 87 F.3d 1242, 1247 (11th Cir. 1996).  Accordingly, the reviewing court may not base its judgment on whether it would have made an administrative decision differently. Instead, the court's only role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Overton Park*, 401 U.S. at 416.  *See also*,  *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 813-14 (1978); *Baltimore Gas & Electric v. NRDC*, 462 U.S. 87, 103 (1983).  In applying this standard, "the focal point for judicial

---

[13]CSF argues that this action should be dismissed based on D'Olive's failure to provide comments to the Corps on the Project before the subject permit was issued.  Upon consideration of this exhaustion issue, the Court concludes, as suggested by the Corps, that this action is due to be dismissed instead on the merits.

review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138 (1973).

        2.      The arbitrary and capricious standard is highly deferential. *Ethyl v. EPA*, 541 F. 2d 1, 34 (D.C. Cir.)(en banc), *cert denied*, 426 U.S. 941 (1976). It presumes the agencies action to be valid. *Overton Park*, 401 U.S. at 419.  The burden of overcoming this presumption is with the party challenging the agency action.  *Sierra Club v. U.S. Army Corps of Eng'r*, 935 F. Supp. 1556, 1565 (S.D. Ala. 1996).  This high degree of deference is particularly important where, as here, the Court is called upon to review determinations involving the Corps' technical expertise.  *See*, *Marsh*, 490 U.S. at 375-78. The standard mandates affirmance of the agency action if a rational basis for the agency's decision is presented.  *Bowman Transportation v. Arkansas-Best Freight System*, 491 U.S. 281, 290 (1974).  This is true even when the court might otherwise disagree. *United States v. Allegheny-Ludlum Steel Corps*., 406 U.S. 742, 749 (1972).  In other words, courts may not intrude upon the discretion of the agency to choose the course of action to be taken. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).  *See also*, *Strycker's Bay Neighborhood Council*, 444 U.S. at  228; *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1539 (11th Cir. 1990)(The court should set aside administrative decisions only for substantial reasons, "not simply because the court is unhappy with the result reached.").

        3.      Instead, the court's only role is to determine whether "the decision was based on consideration of the relevant factors and whether there was a clear error of

judgment." *Marsh*, 490 U.S. at 378(1989), *citing*, *Overton Park*, 401 U.S. at 416. The

Court must find in favor of the agency if the agency "considered the relevant factors and

articulated a rational connection between the facts found and the choice made."

*Baltimore Gas & Electric Co. v. NRDC*, 462 U.S. 87, 105 (1983). In upholding the

agency decision, it is not necessary that all the evidence, or indeed even the weight of the

evidence, supports the agency decision. The fact that conflicting views are expressed

does not thereby render the agency decision invalid or lessen the deference to be accorded

to the findings and actions documented in the administrative record. *North Buckhead*,

903 F. 2d at 1539. It is enough that the agency considered all the relevant factors and that

there is credible evidence in the record to support the decision and the proposed action.

*Bowman Transportation*, 419 U.S. at 285-86.

    4.    As to the specific issue of whether the Corps' decision not to prepare an

Environmental Impact Statement ("EIS") was arbitrary and capricious, the Court looks to

the factors set forth in *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998):

    a.    Whether the agency accurately identified the relevant
          environmental concern.

    b.    Whether the agency took a "hard look" at the problem in
          preparing the EA.

    c.    Whether the agency made a convincing case for its finding of
          no significant impact.

    d.    If the agency found a significant impact, whether the agency
          also convincingly established that changes in the project
          sufficiently reduced it to a minimum.

In determining whether the Corps has complied with NEPA and the regulations here, the Court again need only satisfy itself that the Corps looked to the relevant factors in considering the environmental consequences of the proposed projects and exercised its judgment in a manner that is neither arbitrary nor capricious. *Marsh*, 490 U.S. at 378; *North Buckhead*, 903 F. 2d at 1539; *Environemental Coalition of Broward City v. Myers*, 831 F. 2d 984, 986 (11th Cir. 1987).

5.     It must also be acknowledge that NEPA is not a substantive environmental statute which dictates a particular outcome if certain consequences exist, but is instead a statute which creates a "particular bureaucratic decision making process." *Sierra Club v. Marsh*, 872 F.2d 497, 497 (1st Cir. 1989).  Thus, NEPA is an "action-forcing" statute designed to prevent agencies from acting on incomplete information and to "ensure that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

6.     As to the burden of proof in this case, "under NEPA, the party challenging the agency action bears the burden of showing … that the agency failed to follow NEPA's requirements." *Sierra Club*, 935 F.Supp at 1556 n.12, *citing*, *Druid Hills Civic Ass'n v. Federal Highway Administration*, 772 F.2d 700, 709 n. 9 (11th Cir.1985), and *Sierra Club v. Morton*, 510 F.2d 813, 818 (5th Cir.1975).  Moreover, "it is clear that a presumption of regularity attaches to administrative action." *Florida Power & Light Co. v. Costle*, 650 F.2d 579, 585 (5th Cir. 1981). *See also*, *Sierra Club v. U.S. Army Corps of*

*Engineers*, 295 F.3d 1209, 1223 (11th Cir. 2002) (agreeing that "[a]dministrative action

… comes before the courts clothed with a presumption of regularity").

7.     Summary judgment must "be rendered forthwith" if there are no disputed

issues of material fact and "the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c).  The parties have agreed that, because judicial review of this matter

is based on the Administrative Record on file with this Court, there are no genuine issues

of material facts that would preclude the granting of summary judgment and that the

issues are in fact ones of law.

**B.     The Corps Fully Complied with NEPA in Analyzing the Direct and Indirect
        Impacts of the Project.**

8.     While NEPA mandates the procedures by which agencies must consider the

environmental impacts of their actions, it does not dictate the particular substantive

results the agency must reach as a result of the environmental review.   *Robertson v.*

*Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989);  *Strycker's Bay*

*Neighborhood Council v. Karlen*, 444 U.S. 223, 227-28 (1980), *citing*, *Vermont Yankee*

*Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978).

9.     NEPA's mandate to the agencies is "essentially procedural . . . It is to insure

a fully informed and well-considered decision . . . ."  *Vermont Yankee* , 435 U.S. at 558

(1978).  As the Supreme Court explained:

> Once an agency has made a decision subject to NEPA's procedural
> requirements, the only role for a court is to insure that the agency has
> considered the environmental consequences; it cannot "interject itself

> within the area of discretion of the executive as to the choice of the action
> to be taken."

*Stryker's Bay*, 444 U.S. at 227-28, *citing*, *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976). *See also*, *Southwest Williamson County Community Ass'n, Inc. v. Slater*, 243 F.3d 270, 278 (6th Cir. 2001)(NEPA is not result-oriented; rather, it "compels agencies to collect and disseminate information about the environmental consequences of proposed actions that fall under their respective jurisdictions."). "Under this 'exceedingly deferential' standard, the Court may not substitute its judgment for that of the agency, but may only set aside the Corps' decision for 'substantial procedural or substantive reasons as mandated by statute.'" *Sierra Club*, 935 F. Supp. at 1565, *quoting*, *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541-42 (11th Cir. 1996).

10.     As stated previously, agencies are entitled to considerable deference in the Court's consideration of whether it complied with NEPA. The Court's "role in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one." *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1125, 1127-28 (8th Cir. 1999). The Court cannot substitute its judgment for that of the agency, or "fly speck" it for inconsequential or technical deficiencies. *Louisiana Environmental Society, Inc. v. Dole*, 707 F.2d 116, 122, 123 (5th Cir. 1983).

11.     Where the agency's particular technical expertise is involved, the Court should zealously guard the agency's discretion. *Baltimore Gas & Electric Co.*, 462 U.S. at 103; *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 813-81

(1978).  "When the resolution of the dispute involves primarily issues of fact and analysis of the relevant information 'requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies.'"  *Friends of the Boundary Waters Wilderness*, 164 F.3d at 1128, *citing*, *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 at 377(1989)).  The court is to "defer to the agency's interpretation of equivocal evidence, so long as it is reasonable."  *Central Arizona Water Conservation Dist. v. EPA*, 990 F.2d 1531, 1540 (9th Cir.), *cert. denied*, 510 U.S. 828 (1993).  "Whether an agency's action is arbitrary and capricious depends on whether 'the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Friends of the Boundary Waters*, 164 F.3d at 1121..  *See also*, *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541-2, 546, 547 (11th Cir. 1996)("exceedingly deferential" standard; "NEPA merely prohibits uninformed-rather than unwise-agency action."); *Coalition against a Raised Expressway v. Dole*, 835 F.2d 803, 806-7 (11th Cir. 1988).

12.     The Corps thoroughly evaluated the impacts of the Project at issue in this case, and properly concluded that it would not yield significant impacts.  The Administrative Record documents the thorough analysis by the Corps, and the "hard look"it gave to all the relevant issues, acting in consultation with other federal and state agencies, as well as members of the public, who commented on the permit application.  *Fund for Animals*, 85 F.3d at 541-2, 546, 547.  Despite this extensive administrative

process, D'Olive make a number of unsubstantiated charges about the adequacy of the

Corps' NEPA analysis with particular regard to environmental impacts associated with

the Project.  The Court concludes, for the reasons stated below, that these allegations lack

merit.

> **a.** **The Corps thoroughly addressed impacts to water quality and downstream siltation**.

13.     D'Olive claims the Corps failed to property consider water quality and

downstream siltation problems. ( Plaintiff's Brief [Doc. 27] at pp. 12-16).  The Court

agrees that this contention is without merit.  In point of fact, the Corps' investigation of

these concerns exceeded statutory and C.F.R. requirements.

14.     The common thread that runs through all the written comments received by

the Corps on the permit application is the concern about controlling sediment on this

Project site.  That concern is that if sediment moves off the site, it could have an adverse

impact on the water quality in downstream waters.  There were pre-existing issues with

water quality in the watershed, and it was feared that siltation could harm the endangered

Alabama red-bellied turtle.  (AR Vol. I, Tab 15, pp. 0149-52).  ADEM,  EPA,  FWS, and

ACDNR all indicated they had concerns about this matter, as did the commenting public.

The Corps gave extra consideration to these concerns.

15.     Even though the CWA gives primary responsibility for evaluation of water

quality issues to the states, and even though the Corps permit would not and could not be

issued unless ADEM certified water quality for this Project pursuant to CWA § 401, the

Corps gave close scrutiny to  issues of water quality.  Even after ADEM issued the CWA

§ 401 permit certifying water quality for this Project on March 18, 2005, the Corps

continued to scrutinize this area of concern.  The Corps engaged its in-house experts,

engineers with specialized technical expertise in this area, and had them review CSF's

BMP and Erosion Control Plans.  These experts were also asked to look over the CWA §

401 water quality certification issued by ADEM for this Project, as well as the

Stormwater permit.  The Corps' permit project manager arranged meetings with CSF's

engineers and Corps engineers to discuss the lingering concerns the Corps had with

whether CSF's plans were adequate to control the sediment on site.  The Corps was aware

that siltation from other projects in the vicinity in the waters downstream of the Project

had been an issue in the watershed.  *See e.g.*, (Plaintiff's Brief [Doc. 27] at p. 13).  The

Corps needed to determine if this Project would likely further contribute to an already

existing problem with siltation and water quality in the Project vicinity.  This was

required by NEPA, the 404(b)(1) Guidelines, and the public interest review.

  16.  The Corps engineers provided their analysis to both CSF's engineers and

the Corps project manager.  They, like the commenting agencies and members of the

public, were concerned about sediment staying on the site because of the fragility of the

soils and steep slopes on the site.  (AR Vol. I, Tab 45, pp. 0396-97).  After consultation

with the Corps' engineers, the Regulatory Division of the Corps did have concerns as to

whether CSF's BMP plan "would leave the potential for significant erosion problems."

(AR Vol. II, Tab 59, p. 0728).  The Corps regulators, as well as the Corps' specialized

engineers, also looked at the CWA § 401 water quality certification issued by ADEM for

the Project in order to determine if the conditions required in this permit addressed these

concerns.  (AR Vol. II., Tab 59, p. 0728).  That certification, and the CWA § 402

stormwater permit, included by reference the substantive provisions of manuals and

handbooks with which CSF was required to comply by the terms of its ADEM permits

and Alabama law.  The Corps noted the turbidity performance standard set for the Project

by ADEM, as well as the stringent monitoring and reporting required by that permit.  The

Corps engineers noted the compliance requirements in the ADEM permit, including

mandatory actions should sediment move off the site. Only then did the Corps engineers

conclude and advise the Corps permit project manager:

> Compliance by the applicant with the provisions of the Alabama Handbook
> and applicable Alabama law, as required by its ADEM permits, will address
> runoff conveyance issues.  Adherence by the applicant to the requirements
> of the ADEM permits, and the incorporated Alabama Handbook and the
> applicable Alabama law, should provide for adequate erosion control
> measures for the project.

Memorandum of April 29, 2005, to Permit Project Manager Chuck Sumner from Michael

H. Thompson, P.E., Chief of the Engineering Section (AR Vol. I, Tab 45, pp. 0396-97).

17.     Relying on its in-house experts and utilizing agency technical expertise, the

Corps Regulatory Division concluded that "the project should not add to any pre-existing

water quality impairments in the local watershed or in Mobile Bay."  (AR Vol. II, Tab 59,

p. 0735).  It determined that the Project would not significantly impact water quality.  The

Corps's conclusions, rather than being "inexplicable" as D'Olive maintains, are rational

and reasonable and accordingly deference should be given to them by this Court.  There is

no doubt, as the AR amply demonstrates, that the Corps gave a  "hard look" to this

project's potential impacts on water quality.  Its findings on these impacts, and its

decision to issue a permit to CSF for this Project, are not "arbitrary and capricious," but

are instead rational and well-reasoned.  *See e.g.*, *Baltimore Gas & Electric Co.*, 462 U.S.

at 105.

### b. <u>The Corps thoroughly addressed indirect impacts on endangered species</u>.

18.     D'Olive contends that the Corps failed to thoroughly address the Projects

impacts on the endangered species.  (Plaintiff's Brief [Doc. 27] at pp. 16-19). This

allegation is specious.  It would appear that D'Olive either misunderstands the basic

requirements of the Endangered Species Act ("ESA") or misunderstands the facts of this

case as they relate to ESA.  In any event, the Court agrees that the AR establishes that the

Corps gave careful consideration of the potential impacts of this Project on the only

endangered species of concern in this matter, the Alabama red-bellied turtle.

19.     Congress enacted the ESA "to provide a means whereby the ecosystems

upon which endangered species and threatened species depend may be conserved, [and]

to provide a program for the conservation of such endangered species and threatened

species." 16 U.S.C. § 1531(b).  Section 7(a)(2) of the ESA provides that federal agencies

must ensure that any action authorized, funded, or carried out by such agency (including

permit actions) is not likely to "jeopardize the continued existence of any endangered

species or threatened species or result in the destruction or adverse modification of habitat

of such species which is determined by the Secretary . . . to be critical."  16 U.S.C. §

1536(a)(2).[14]  To achieve this objective, the ESA requires the action agency to consult

with FWS  whenever a federal action "may affect" an endangered or threatened species.

50 C.F.R. § 402.14(a).

20.    Section 7 and its implementing regulations set out in detail the consultation

procedures designed to provide agencies with expert advice to determine the biological

impacts of proposed activities. 16 U.S.C. § 1536(b); 50 C.F.R. Part 402.  "Formal

consultation" is described at length at 50 C.F.R. § 402.14.  Formal consultation

culminates in the issuance of a "biological opinion" by FWS or NMFS, which advises the

action agency whether jeopardy is likely to occur for any listed species and, if so, whether

"reasonable and prudent alternatives" exist to avoid a jeopardy situation.  *Id*. at §

402.14(h)(3).  The ESA's implementing regulations also recognize the use of "informal

consultation" to assist an action agency in determining whether and when further

consultation is necessary.  Informal consultation "includes all discussions,

correspondence, etc., between the Service and the Federal agency or the designated non-

Federal representative prior to formal consultation, if required."  50 C.F.R. § 402.02.

---

[14]"Jeopardize the continued existence" means "engag[ing] in an action that reasonably
would be expected, directly or indirectly, to reduce appreciably the likelihood of both the
survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or
distribution of that species."  50 C.F.R. § 402.02.  Critical habitat includes "the specific areas
within the geographical area occupied by the species . . . on which are found those physical or
biological features (I) essential to the conservation of the species and (II) which may require
special management considerations or protection. . . ."  16 U.S.C. § 1532(5)(A).

21.     D'Olive alleges that the Corps has improperly "written off" endangered or threatened species because, of the 21 threatened and endangered species known to exist in Baldwin County,[15] it only considered impacts to the Alabama red-bellied turtle. (Plaintiff's Brief [Doc. 27] at pp. 16).   Although facially correct, that allegation fails to allege any wrongdoing by the Corps.  That is because of all the threatened and endangered species known to exist in Baldwin County, the Alabama red-bellied turtle is the only one with a suitable habitat that could potentially be impacted by this Project. This was in fact determined not by the Corps, but by the expert in this field – FWS.  (AR Vol. I, Tab 15, pp. 0149-52).  The Corps concurred with FWS's determination that the only species of concern for this permit action was the Alabama red-bellied turtle.  AR Vol. II, Tab 59, pp. 0722-23).  All ESA reviews begin with an examination of whether suitable habitat for known species exists. If suitable habitat for a species does not exist on the site in question or exists but cannot be impacted by a project, it is not practical to give further consideration to potential impacts of the Project on that species.  Conversely, if suitable habitat does exist, even if there are no documented sightings of the species on the site, potential impacts on the species are assessed.

22.     Here, the Corps and FWS determined that suitable habitat occurs on the property only for one threatened and endangered species, the Alabama red-bellied turtle. (Corps finding: AR Vol. II, Tab 59, p. 0722; FWS finding: AR Vol. I, Tab 15, pp. 0149-

---

[15]FWS maintains the list of endangered species for Baldwin County, and this list is set out in the full in the Corps' Environmental Assessment at AR Vol. II, Tab 59, pp. 0722-23.

52).  There is no evidence in the record that would warrant a closer examination of issues

for other threatened and endangered species, and no allegation in D'Olive's complaint or

brief in this matter that would warrant such an inquiry.  Therefore, the Corps, in reliance

on its consultation with the experts at FWS, appropriately focused its evaluation on the

potential impacts of the Project on the Alabama red-bellied turtle.

23.     It is undisputed that if erosion on the Project site is not controlled, excessive

sedimentation in the waters downstream may occur, and this poses a potential risk to the

Alabama red-bellied turtle.  This specific concern was a significant factor driving the

Corps' very close scrutiny to the erosion/sedimentation/water quality issues.  As detailed

above, the Corps gave a "hard look" at these issues, and determined that erosion and

sediment run-off could be controlled, and thus that there were no significant impacts that

would likely adversely affect the Alabama red-bellied turtle.  FWS agreed with this

conclusion.  (AR Vol. II, Tab 54, pp. 0496-97).

24.     To the extent D'Olive implies that the Corps should have engaged the FWS

in the formal consultation procedures set forth in § 7 of the ESA, it clearly confuses the

discussion in the AR by both the Corps and FWS of *potential* impacts, with those that *will*

*occur* or *are likely to occur*.  As set out above, formal consultation is not always required

to resolve ESA issues.  "If the action agency believes that the proposed action may affect,

but is not likely to adversely affect the listed species, then it may request that FWS concur

with this determination and thus engage in informal consultation only."  50 C.F.R. §

402.13.  This is exactly what occurred in this case, and resulted in a finding by both the

Corps (AR Vol. II, Tab 59, p. 0723), and FWS (AR Vol. II, Tab 54, pp. 0496-97), that

"no adverse impacts to this species will likely occur."

     25.    Resolution of ESA issues by means of informal consultation procedures has

been repeatedly upheld by the Courts as appropriate and legally sufficient. *See e.g.*,

*PEACH*, 916 F. Supp. 1557, 1569 (N.D. Ga. 1995), *aff'd*, 87 F.3d 1242 (11th Cir.

1996)(upholding Corp's use of informal consultation regarding impacts from highway

construction); *Sierra Club*, 295 F.3d at 1222-23 (11th Cir. 2002)(upholding Corps' use of

informal consultation concerning alleged impacts from construction of Surcoat Parkway).

     26.    The Corps fully considered the indirect impacts of this Project on the

Alabama red-bellied turtle.  Its findings regarding endangered and threatened species do

not violate the "arbitrary and capricious abuse standard."   Indeed they are rational and

well-reasoned, the result of the required "hard look."  *Baltimore Elec. & Gas, Co.*, 462

U.S. at 105.

     **c.**    **The Corps thoroughly addressed impacts on air quality.**

     27.    D'Olive's contention that the Corps' consideration of air quality impacts

was inadequate centers primarily on an allegation that the Corps failed to appropriately

consider the increased motor vehicle traffic expected to result from the Project, and thus

the increase in emissions that might impact air quality.  (Plaintiff's Brief [Doc. 27] at p.

19).   In an APA review, disagreement with results does not constitute inadequacy of

review.  As set forth clearly in the AR, the Corps was aware that this Project would result

in increased traffic in the area. It had this information with the initial application for a

51

permit.  (AR Vol. I, Tab 2, pp. 0028 and 0037).  CSF also  submitted for Corps review an

extensive 205-page Transportation Systems Analysis (AR Vol. II, Tab 55, pp. 0500-705),

which predicted increases in traffic as a result of construction of the Project.

28.     The Corps carefully considered these reports and the potential impacts on

air quality that might result from increased traffic.  As set forth in the Corps' EA: "After

project completion, the use of automobiles and other vehicles, mostly by customers at the

shopping mall, will further contribute to emissions."  (AR Vol. II, Tab 59, p. 0724).

However, after consideration of the expected impacts from emissions from the predicted

increased traffic, as well as short term impacts expected from heavy equipment working

at the site during the construction phase, the Corps determined impacts from those

emissions would be "minor."  (AR Vol. II, Tab 59, pp. 0724-25).

29.     D'Olive may disagree with the conclusions reached by the Corps as to

impacts to air quality expected from this Project, but its contention that the Corps did not

sufficiently analyze or consider impacts to air quality is belied by the AR compiled by the

agency in this matter.  The courts are to be guided by a "rule of reason" in determining

whether the corps's decision regarding impacts was arbitrary and capricious.  *Sierra Club*

*v. John Marsh, Jr.*, 976 F. 2d 763, 767 (1st Cir. 1992).  Would a reasonable person under

the circumstances have thought that the potential impacts would likely result in

significant environmental harm requiring a more detailed evaluation?  The Corps fully

considered this issue, and its decision that air quality impacts would be minor and to issue

a permit to Applicant for this Project on the basis of an EA and without requiring an EIS

is not "arbitrary and capricious."

       **d.**     **The Corps thoroughly addressed impacts of noise in surrounding neighborhoods**.

30.     D'Olive contends the Corps' conclusions regarding noise impacts were

drawn out of "thin air," and thus were inadequate for permit issuance.  (Plaintiff's Brief

[Doc. 27] at p. 21).  D'Olive's arguments focus again on traffic expected to result from

the construction of the shopping center.  The Corps' conclusions with regard to the noise

impacts are not drawn out of "thin air," but are rational and fully articulated in the EA.

The Corps did not conclude, as D'Olive maintains, that "more noise won't make a

difference."  It concluded that the noise impacts from this Project would be minimal. It

properly took into account that the proposed Project is in the proximity of a major

interstate, busy state highways, and other commercial development.  Although no tests

were conducted by the Corps, none were required, and the Corps made reasonable

inferences about the likely noise impacts of this Project based on a full consideration of

reasonably foreseeable actions with regard to the permitted activity.  (AR Vol. II, Tab 59,

p. 0730).[16]  *See*, *Isaak Walton League of Amer.  v. Marsh*, 655 F. 2d 346, 377 (D.C. Cir.

---

[16]At page 21, D'Olive's Brief gives the citation to the discussion in the Corps EA on noise impacts as AR Vol 6, Tab 236, p. 1829.  This is incorrect and the correct cite is the one noted in the text above.  This is apparently a reference to the Corps EA in the Arkansas litigation cited in this brief at note 8 in which there are notably similar issues raised.).  D'Olive also draws unreasonable inferences from the discussion of this issue in the Corps' decision documents as contained in the Administrative Record.  For example, D'Olive states at page 21 that the Corps failed to take into account the "screeching tires" and "honking of horns" that it asserts will be a part of the landscape if this Project is built.  Although "screeching tires" and "honking of horns"

1981)("where adverse impacts are not likely, expensive and time consuming studies are not necessary.")

31.    D'Olive has not met its burden of establishing a violation of the arbitrary and capricious standard by the Corps' in its conclusion that this Project will not significantly impact the noise already present at this site.  The finding by the Corps that "impacts of the new temporary and permanent noise source would be minimal" (AR Vol. II, Tab 59, p. 0730), is fully supported by the AR.  The Corps fully considered this issue, and its finding that this Project would not cause significant noise impacts is rational and well-reasoned, and is not arbitrary and capricious.  *Baltimore Gas and Electric Co.*,  462 U.S. at 105.

      **e.**    **The Corps thoroughly addressed impacts on traffic**.

32.    D'Olive charges that the Corps' analysis of the direct and indirect impacts on the environment from traffic is inadequate.  (Plaintiff's Brief [Doc. 27] at pp. 22 - 26). The record, however, clearly demonstrates that the Corps reviewed and analyzed the direct, indirect and cumulative impacts on traffic.  Traffic at the proposed location was an important factor in a variety of contexts for this Project, including as noted previously the analysis of noise and air quality impacts.  For site selection, high visibility from an interstate highway was determined important by this developer.  The intersection which

---

likely occur occasionally at any location where there is vehicular traffic, there is no evidence that these activities are more prevalent at shopping malls in general, or that there is reason to expect that these activities will be more prevalent at this particular shopping mall.

became its preferred alternative was one which already had significant traffic, thus providing a market base for the shopping mall. (AR Vol. I, Tab 2, p. 0028; Tab 27, pp. 0211 and 0225). The purpose of the Project was to build a shopping complex that would offer over a million square feet of retail space to which customers would travel by automobile. As part of its business planning process, CSF, therefore, undertook a thorough study of infrastructure in place, as well as existing traffic patterns. It provided this information in summary form to the Corps in its initial application, (AR Vol. I, Tab 2), and in additional materials provided on alternatives.

33. From the beginning, CSF provided the Corps with a wealth of information and data from which it could fully evaluate the Project's traffic impacts. The Corps took note of the existing traffic patterns in the area, and was aware that if successful, this Project would draw additional traffic to the roads and intersections in question. (AR Vol. II, Tab 59, p. 0730). The Corps noted that CSF had a plan to manage traffic and that CSF was coordinating these plans and working with local officials and the Alabama Department of Transportation ("ALDOT"). (AR Vol. II, Tab 59, p. 0737). The Corps stated that any localized effects on vehicular traffic patterns must be consistent with state and local laws and regulations with which CSF must comply. Not only did the Corps thoroughly review traffic patterns expected as a result of the issuance of the Corps permit, it sought and received assurance from ALDOT that the proposed improvements would manage the projected increase in traffic. (AR Vol. II, Tab 59, p. 0706).

34.     D'Olive claims that since the Corps received the full Traffic Analysis and

talked to the ALDOT representative (Jackie Glasgow) shortly before permit issuance, it

did not seriously consider impacts from traffic, nor have sufficient time to review the

traffic study.  (Plaintiff's Brief [Doc. 27] at p. 23). CSF, however, provided information

on traffic at the commencement of the permit application process, and did so on numerous

other occasions.  These impacts were an important part of the Corps' year long evaluation

of the permit.   Obtaining the full 205-page report and consulting with ALDOT ensured

that the Corps AR was complete, and accurately reflected that the Corps gave sufficient

attention in sufficient detail to reach the conclusions necessary regarding traffic impacts.

35.     Importantly, the Corps observed that any traffic improvements would

involve primarily modifications to existing highways and roads.  Plans included new

traffic signals and the widening of already existing roads. The Corps noted:

> Because there are no streams, wetlands or forested areas along U.S. 90/98,
> other than at the proposed mall site, such traffic improvements would not be
> expected to cause additional environmental impacts.

(AR Vol. II, Tab 59, p. 0737).

36.     Clearly the Corps considered the impacts from traffic that might result if a

permit was issued.  It reasonably concluded that any impacts to or from traffic would be

not be significant, and that an EIS was not needed to fully consider the impacts.  Its full

consideration of issues and impacts related to traffic satisfied NEPA and the public

interest review and also complied with the 404(b)(1) Guidelines.  The decision by the

Corps that traffic would not cause significant direct, indirect or cumulative impacts was

reasonable and therefore not "arbitrary and capricious."  *Baltimore Elec. & Gas Co.*, 462

U. S. At 105.

###    f.    The Corps thoroughly addressed aesthetic impacts

37.     D'Olive claims the Corps did not "generate hard data" regarding aesthetics,

and improperly considered the existing aesthetic in which the proposed project is to be

located.  (Plaintiff's Brief [Doc. 27] at pp. 26-27).  D'Olive fails to proffer any

suggestion, however, as to what "hard data" the Corps could or should have obtained to

more thoroughly consider this issue.

38.     The Corps in the EA states "[a]esthetics are highly subjective." AR Vol. II,

Tab 59, p. 0729).   It noted that "[M]any people could consider the development neutral

or aesthetically pleasing. Others would consider commercial development as aesthetically

damaging."  (AR Vol. II, Tab 59, p. 0729).  The courts have repeatedly recognized the

subjective nature of the NEPA inquiry regarding aesthetics. *River Road Alliance v. Corps

of Engineers*, 764 F.2d 445, 451 (7th Cir. 1985), *cert. denied*, 475 U.S. 1055 (1986)

("[a]esthetic values do not lend themselves to measurement or elaborate analysis);

*Maryland-National Capitol Park & Planning Comm'n v. U.S.P.S.*, 487 F.2d 1029, 1038-9

& n.5 (D.C. Cir. 1973)("a 'substantial inquiry' …was not contemplated, as a matter of

reasonable construction of NEPA, where the claim of NEPA application is focused on

alleged esthetic impact and the matters at hand pertain essentially to issues of individual

and potentially diverse tastes.").

39.    The Corps' finding that potential impacts to aesthetics from the proposed

project were not expected to be significant was supported in the AR.  (AR Vol. II, Tab 59,

pp. 0729-30).  Although before construction the site was wooded, the Corps appropriately

took into account the existing aesthetic environment consists of a highly trafficked

intersection with commercial enterprises, and residential neighborhood.  The Corps fully

considered the issue of aesthetics, and its decision to issue a permit to CSF for this Project

was reasoned and was not arbitrary and capricious.  The fact that D'Olive might have

reached a difference conclusion is an insufficient basis to overturn the Corps' decision.

(AR Vol. I, Tab 27, pp. 0204-32; Tab 30, pp. 0246-50; Tab 34, pp. 0341-56).  Upon

request by the Corps, it later provided the full 205-page Traffic Analysis prepared for it

by consultants. (AR Vol. II, Tab 55, pp. 0500-705).

**C.    The Corps Fully Complied with NEPA in Analyzing Cumulative Impacts of the Project.**

40.    A reasonable cumulative impacts analysis is to include: "(1) the area in

which the effects of the proposed project will be felt; (2) the impacts that are expected in

that area from the proposed project;  (3) other actions -- past, present, and reasonably

foreseeable proposed -- that have had or are expected to have impacts in the same area;

(4) the impacts or expected impacts from these actions; and (5) the overall impact that can

be expected if the individual impacts are allowed to accumulate." *Georgia River Network*

*v. United States Army Corps of Eng'rs*, 334 F. Supp.2d 1329 (D. Ga. 2004) citing to

*Grand Canyon Trust v. Federal Aviation Administration*, 290 F.3d 339, 345 (D.C. Cir.

2002); *Stewart v. Potts*, 126 F. Supp.2d 428, 437 (S.D.Tex. 2000).

41.    D'Olive contends that in issuance of this particular permit "the cumulative

effect of other past, present and future projects in the Spanish Fort/Mobile Bay area have

not been discussed, let alone seriously studied in the EA."  (Plaintiff's Brief [Doc. 27] at

p. 30).  This contention has no merit.  In point of fact, the Corps extensively discussed

impacts from past, present and future projects, both direct and cumulative.  Past and

present projects are noted in the EA in comments on the existing environment:

> Jubilee Square Shopping Center is located on the South side of Interstate 10,
> across from the proposed development. U.S. Highway 98 in Daphne is
> heavily developed with  commercial development. U.S. Highway 98 north
> of the proposed development and  U.S. Highway 31 in Spanish Fort are
> developed with shopping areas, convenience stores and a grocery store.

(AR Vol. II, Tab 59, pp. 0729-30).  Consideration of past and future projects are also

evidenced in the numerous references in the AR, in a variety of contexts, to the fact that

the area "has experienced  significant residential and commercial growth in the last

decade" (AR Vol II, Tab 59, p. 0721), and that this trend is expected to continue. (AR

Vol. II, Tab 59, pp. 0717, 0721, 0731, and 0735).

42.    In order to assess cumulative impacts, the Corps also reviewed wetland

acreage previously permitted by the agency along nearby waterways.  It noted it had

permitted 8.6 acres of wetland fill along Bay Minette Creek, .3 acres along D'Olive

Creek, 20.32 acres along Fish River, 9.2 acres along Tiawassee Creek, 1.2 acres along

Turkey Creek, and .49 acres along Yancy Creek. These totaled 42.36 acres.  (AR Vol. II,

Tab 59, p. 0733).  Although it had at the time no specific knowledge of future

development, the Corps specifically stated that in the issuance of this permit, it took into

account that  it expected "the public will continue to apply for Department of the Army

permits" to fill wetlands.  (AR Vol. II, Tab 59, p. 0734).

43.     Previous and ongoing problems with erosion control and siltation of streams

in the watershed were a primary concern of commenting resource agencies and the public,

and one reason the issue of water quality received so much attention from the Corps.  It

found that "this project should not add to any *pre-existing* water quality impairments

either in the local watershed or in Mobile Bay."  (AR Vol. II, Tab 59, p. 0735) (emphasis

added).   The Corps did precisely what NEPA and the regulations require in a cumulative

impacts assessment, and evaluated numerous potential impacts of this Project in light of

past, present and future projects impacts in the vicinity of the proposed mall.

44.     In its brief at page 30, D'Olive starts a "list" of the projects that it alleges

the Corps failed to consider in its cumulative impacts assessment and which it describes

as "ones that a person of ordinary prudence would take into account in reaching a

decision."  The start of the list is, however, the end in that D'Olive only discusses what it

identifies as "Project-Related Transportation Infrastructure." (Plaintiff's Brief [Doc. 27]

at p. 30).  D'Olive alleges that the Corps "shrugs off" indirect and cumulative impacts of

the transportation infrastructure, in addition to improperly segmenting this portion of the

Project.  Contrary to D'Olive's interpretation, the AR makes clear that in making the

decision to permit this project, the Corps considered the existing transportation

60

infrastructure, improvements that might be required as a result of this Project, as well as improvements that might be needed in the future given the high growth rate for this part of Baldwin County.

45.     For example, as discussed above, using the data provided in the Traffic Analysis, the Corps noted the existing traffic at the site, and that additional traffic could generally be expected from growth in this area, and specifically if this Project were permitted.  (AR Vol. II, Tab 59, pp. 0735-36).  The EA contains a discussion of the present level of service from existing traffic infrastructure, and the need for improvements.  The Traffic Analysis contained specific recommendations, and the Corps even took note of a much discussed larger traffic project:  "A proposed widening of the I-10 bridge over Mobile Bay has been under study by the U.S. Federal Highway Administration and the Alabama Department of Transportation for several years prior to submission of the subject permit." (AR Vol. II, Tab 59, p. 0737).  Significantly, the expected traffic infrastructure improvements recommended here might be better characterized as modifications. Additional traffic signaling on existing roads is recommended.  Existing roads are to be widened.  Turning lanes are to be designated. (AR Vol. II, Tab 55, pp. 0535-38).  The Corps specifically noted that such improvements would not be expected to impact aquatic resources in the area.  (AR Vol. II, Tab 55, p. 0736).  This was a reasonable and prudent conclusion for the Corps to reach in the EA.

46.     The Corps, therefore, evaluated potential impacts of improvements that might be required as a result of this Project both in the context of the existing

61

transportation infrastructure, as well as in light of other improvements that might be needed in the future as a result of other and future development.  The Corps's determination that impacts from any needed infrastructure development would not be significant is rational and supported by the record.  The NEPA process "'was not intended to be a substitute community planning device.'"  *Isle of Hope Historical Ass'n v. U.S. Army Corps of Eng'r*, 646 F. 2d 215, 221 (5th Cir. 1981), *quoting*, *Concerned about Trident v. Rumsfeld*, 555 F. 2d 817, 829 (D.C. Cir. 1976).

47.    Evaluation of cumulative impacts of this Project, including those from potential traffic infrastructure improvements, does not require preparation of an EIS.  The Corps' findings in this regard are not "arbitrary and capricious;" they are rational and well-reasoned.  *Baltimore Gas & Elec. Co.*, 462 U.S. at 105.

**D.    The Corps did not improperly Segment any portion of this Project.**

    **a.    <u>Transportation Infrastructure Improvements</u>.**

48.    D'Olive contends that the modifications to infrastructure recommended in CSF's Traffic Analysis are "connected actions" and that the Corps improperly segmented these improvements from the Project.  It argues these traffic infrastructure improvements would not be considered or undertaken "but for" this Project. (Plaintiff's Brief [Doc. 27] at p. 31).  To the contrary, the AR amply documents that there has been significant development in the past, and there is expected future development along this Baldwin County stretch of Interstate 10, and throughout the Spanish Fort and Daphne communities.  D'Olive's conclusion that no improvements will be needed "but for" the

Project, is simply incorrect.  It is more reasonable to predict, as the Corps did, that this area will continue to be developed commercially for the foreseeable future, with or without Projects requiring Corps permits, and thus that infrastructure improvements will be needed whether the permit at issue was granted or denied.  (AR Vol. II, Tab 59, pp. 0735-37).  Any future infrastructure improvements (even if limited only to new traffic signaling and widening of existing roads as is recommended in the Traffic Analysis) will be primarily if not exclusively within the expertise and permitting jurisdiction of federal and state agencies other than the Corps.  The Federal Highway Administration, ALDOT and the City of Spanish Fort will have jurisdiction over any traffic infrastructure improvements.  (AR Vol. II, Tab 59, pp. 0735-37).

49.    Infrastructure improvements are a separate project, not a connected activity that must be permitted with this Project. CSF provided documentation that it was working with ALDOT and local officials on infrastructure needs.  (AR Vol. II, Tab 59, p. 0736).  The Corps is to limit the scope of its environmental analysis to portions of projects subject to its regulatory jurisdiction.  *Save the Bay v. U.S. Army Corps of Eng'r*, 610 F. 2d 322, 327 (5th Cir. 1980);  *Winnebago Tribe of Nebraska v. Ray*, 621 F. 2d 269, 272-73 (8th Cir. 1980).  Scope of analysis determinations by federal agencies should be given deference by the reviewing court.  *National Wildlife Fed'n v. Whister*, 27 Fed. 3d 1341, 1344-46 (8th Cir. 1994).  NEPA, the Guidelines, and Corps regulations did require the Corps to consider and evaluate all impacts (whether direct, indirect or cumulative) to and from traffic, including infrastructure.  As shown above, the Corps did so in the EA and as

63

it made its  permit decision.  There was no improper segmentation by the Corps of potential traffic infrastructure improvements resulting from this Project.

### b. **Permit for Wetland Fill and Stream Impacts on the Adjacent Site.**

50.    The Corps did not segment the permitting of a development CSF proposes on the adjacent site as claimed by D'Olive.  (Plaintiff's Brief [Doc. 27] at p. 37).  *Cf.*, Federal Defendants' Response to Plaintiff's Motion for Reconsideration (Doc. 44) at pp. 5 -13.  Indeed the Corps was unaware that Applicant was contemplating a 40 acre expansion of the shopping mall.  The permit for the adjacent site was not filed until three months after approval of the subject permit.  (Fed. Defendant's Exhibit II, Sumner Affidavit at ¶ 8).

51.    The Corps is required to undertake two very important activities as it considers any proposed activity: (1)  It must determine that the project for which a permit is sought has independent utility; and (2)  It must consider all direct, indirect, secondary and cumulative impacts of proposed projects on the environment.  In doing so, it must consider not only the immediate project being evaluated, but existing development in the area and development reasonably foreseeable for the area.

52.    With regard to the first obligation, the central question is whether a project "will serve a significant purpose even if a second related project is not built….Only when a given project effectively commits decision makers to a future course of action will this form of linkage argue strongly for joint environmental evaluation."  *Florida Keys Citizens Coalition v. United States Army Corps of Engineers*, 374 F. Supp. 2d 1116, 1150 (S.D.

Fla. (2005), citing, *Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Eng'rs*, 87 F. 3d 1242 (11th Cir. 1996).  As stated in *Pamlico-Tar River Found. v. United States Army Corps of Eng'rs*, 329 F. Supp. 2d 600,616 (E.D.N.C. 2004): "….segmentation of one phase of a larger project prior to the completion of the environmental review of the entire project constitutes impermissible segmentation only if the component action has a 'direct and substantial probability of influencing [the agency's] decision' on the larger project."  *State of S.C. ex rel., Campbell v. O'Leary*, 64 F.3d 892, 898-99 (4th Cir. 1995), *quoting*,  *State of N.C. v. City of Virginia Beach*, 951 F.2d 596, 603(4th Cir.1991).

53.    Here, both projects clearly have independent significance and utility. The appropriate question is whether Corps' denial of a permit for the 40-acre site will still leave CSF with a project on the 220-acre site that can be built. Does it have utility and function separate from the project proposed on the 40 –acre site, and independent of the project proposed for the 40-acre site?  Clearly it does.

54.  In conducting the environmental review, the Corps had to consider the existing environment in which the 220-acre project (the only one for which the Corps had an application) was proposed, and also look at any reasonably foreseeable actions that might impact that environment.  It did so: "Surrounding land use consists of residential areas, shopping areas and an interstate highway.  The project site is located in an area that has experienced significant residential and commercial growth during the past decade." (AR Vol. II, Tab 59, p. 0721).  So, although the Corps did not have the application to

develop the 40-acre site until after it issued the permit for the 220-acre site, the record clearly reflects that the Corps was aware that additional commercial development in the vicinity was reasonably foreseeable.(AR Vol. II, Tab 59, p. 0763).

55.     Now that CSF has filed a permit with the Corps to impact this site, the Corps can and will deal directly with existing conditions at this site, both singly and in combination with the impacts from the 220-acre site.  It is important to understand  that if CSF wanted to develop both the 220-acre site and the 40-acre site, there was no way for them to avoid consideration by the Corps of combined impacts from both sites together. The only issue is when that review would occur:  In the Corps' evaluation of the permit to impact the 220-acre site, or at some later date.  As long as all the Corps had was an application for the 220-acre site, and as long as that proposed development had independent utility, the Corps could only make general assumptions about future development, at the 40-acre site or elsewhere. It did just this as is demonstrated in the decision documents for the permit action.  This determination was not "arbitrary, capricious, an abuse of discretion, otherwise contrary to law."

### F.     The Corps' Alternatives Analysis is not flawed.

56.     NEPA, the 404(b)(1) Guidelines, and the "public interest" determination the Corps must make before issuance of a CWA § 440 permit all require sufficient examination of alternatives so as to allow the Corps a reasoned choice in the decision to issue the permit.  The party challenging the agency's decision has the burden of proving

that the scope and extent of the agency's discussion of alternatives was unreasonable.

*Sierra Club*, 935 F. Supp. at 1574. The Court there also stated:

> Accordingly, the Corps' obligations under NEPA were not to present a detailed EIS, but merely to "study, develop, and describe appropriate alternatives to recommended courses of action" pursuant to an EA. 42 U.S.C. § 4332(2)(E); see also *Druid Hills Civic Ass'n v. Federal Highway Administration*, 772 F.2d 700, 713 (11th Cir. 1985)(noting that consideration need only be given to reasonable alternatives). As stated previously, the Corps is permitted to perform a less detailed analysis of the various alternatives in an EA than it would in an EIS. Furthermore, the Corps is free to consider a narrower range of alternatives where no significant environmental impact is found than it would otherwise, as the range of alternatives which need be considered is directly proportional to the environmental impact of the proposed action. *See Friends of the Ompompanoosuc v. F.E.R.C.*, 968 F.2d 1549, 1558 (2d Cir. 1992); *Sierra Club v. Espy*, 38 F.3d 792, 796 (5th Cir. 1994). In general, the agency need only adhere to a "rule of reason" both in deciding which alternatives to consider and in determining the extent to which it must discuss them in NEPA documents. *See Citizens Against Burlington. Inc. v. Busey*, 290 U.S. App. D.C. 371, 938 F.2d 190, 195-96 (D.C. Cir. 1991)(agency discussion of alternatives upheld so long as alternatives are reasonable and agency discusses them in reasonable detail). Under NEPA, the party challenging the agency's decision shoulders the burden of proving that the scope or extent of the agency's discussion of alternatives was unreasonable. *See Sierra Club v. Hodel*, 848 F.2d 1068, 1089 (10th Cir. 1988) (*quoting Park County Resource Council, Inc. v. United States Department of Agriculture*, 817 F.2d 609, 621 (10th Cir. 1987)).

*Sierra Club*, 935 F. Supp. at 1574.

57.    Here, CSF maintained in its application and through the evaluation process

that it had a strong preference for the site at the intersection of Interstate 10 and Highways

90/98. It presented abundant market research and economic analysis to demonstrate how

the company arrived at this conclusion. Initially examining potential sites along the I-10

corridor from West Florida to Mississippi, it narrowed its focus to the two Alabama

coastal counties, Mobile and Baldwin.  It provided an alternative analysis that evaluated five sites in these two counties.  (AR Vol. I, Tab 34, pp. 0341-56).  This analysis was presented in full in the Corps EA.  (AR Vol. II, Tab 59, pp. 0738-43 & 0756-59). Importantly, all five sites would require impacts to wetlands.  (AR Vol. II, Tab 59, pp. 0739-40).  Here, the Corps was persuaded that there were no practicable sites that would meet CSF's project purpose that would avoid wetland impacts.  "[T]he Corps has a duty to take into account the objectives of the applicant's project."  *Louisiana Wildlife Fed'n v. York*, 761 F. 2d 1044, 1048 (5th Cir. 1985).  The Corps was thus then required to determine whether among the alternatives presented by Applicant, there was a alternative with less environmentally damaging impacts than the applicant's preferred site.

58.     In making this determination, the Corps reviewed the alternatives evaluation matrix presented by CSF.  It did not accept this matrix at face value, but reviewed it carefully to determine the reasonableness of the criteria on which CSF proposed that the alternative sites be evaluated.  The Corps questioned, and rejected or modified, a number of the criteria proposed by CSF.  It changed "Visibility from I-10" to "Visibility from an Interstate Highway."  (AR Vol. II, Tab 59, p. 0740).  It determined that "Higher Demographic Income" and "Proximity to High Income Population" were similar and that one should be eliminated.  (AR Vol. II, Tab 59, pp. 0740-41).  It eliminated CSF's proposed evaluative criteria of "Highest Probability of City Sponsored Subsidies/Tax Zones" as understandably desirable by developers, but not an appropriate consideration under NEPA.  (AR Vol. II, Tab 59, p. 0741).  Finally, the Corps eliminated

68

"Avoidance of Environmental Impacts as a % of the Total" because it gave a disproportionate value for these impacts when wetland impacts were already a stated criterion.  (AR Vol. II, Tab 59, p. 0741).

59.     In its final analysis, the Corps also eliminated from serious consideration the Mobile County sites included in CSF's alternatives analysis.  Noting that these sites in any case did not score as well as the Baldwin County sites, and all involved impacts to wetlands, the Corps was persuaded by the extensive information presented by CSF that only Baldwin County sites were practicable for CSF.  The Corps then in its final analysis, evaluated as practicable alternatives only the three  Baldwin County locations, weighing them against twelve different criteria.  There were environmental impacts from all the alternative sites determined by the Corps to be practicable.  It determined that the site permitted was the least environmentally damaging practicable alternative.[17]

60.  The Corps conducted its own independent evaluation of alternatives and appropriately balanced CSF's needs and environmental concerns to permit this project. "The Court's inquiry is not whether the Corps has clearly demonstrated a lack of practicable alternatives, but whether its decision that [the applicant] had done so was a clear error of judgment.  Did the Corps' failure to  adequately consider various

---

[17]The Corps permit required mitigation for impacts to wetlands by purchase of credits from a mitigation bank at a ratio of 2 - 1, and so a total of 26.8 credits for the 13.4 acres of wetlands impacted, at an estimated cost of $201,000, thus resulting in "no net loss of wetlands." Mitigation for potential stream impacts is accomplished by preservation of a 100 to 200 foot wide buffer along the entire 4,069 linear feet of Joe's Branch.  (AR Vol. II, Tab§ 61, pp. 0793 and 0803).

alternatives rise to the level of an arbitrary and capricious action?" *Alliance for Legal Action v. U.S. Army Corps of Eng'r*, 314 F. Supp 2d 534, 543 (N.C. 2004). "The Corps is required only to "consider and evaluate 'reasonable' alternatives in a reasonable manner." *Sierra Club*, 935 F.Supp. at 1576. That is what the Corps did in this case. Based on an extensive independent analysis, the Corps' finding that the permitted project is the least damaging practicable alternative for CSF is rational and well-reasoned; and it cannot be said that it violated the arbitrary and capricious standard.

## CONCLUSION AND ORDER

For the reasons set forth above, the Court concludes that the Federal Defendants legally complied with their duties under the Clean Water Act and NEPA, and that its issuance of the permit to Intervenor-Defendant CSF was not "arbitrary, capricious, an abuse of discretion nor was it  otherwise in violation of law. It is, therefore, **ORDERED** that Defendants' Cross-Motions for Summary Judgment (Docs. 47 and 50) be and are hereby **GRANTED** while Plaintiff's Motion for Summary Judgment (Doc. 26) be and is hereby **DENIED**. It is accordingly **FURTHER ORDERED** that **JUDGMENT** be entered in favor of the defendant, United States Army Corps of Engineers, and the intervenor-defendant, Cypress/Spanish Fort I, L.P., and against the plaintiff, D'Olive Bay Restoration and Preservation Committee, Inc., the plaintiff to have and recover nothing of the defendants, and that this action be and is hereby **DISMISSED with prejudice**.

**DONE** this 15th day of March, 2007.

_____ s/ W. B. Hand _____
SENIOR DISTRICT JUDGE